**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | | |
|---|---|---|
| FLAGSTAR BANK, FSB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| KEITER, STEPHENS, | ) | |
| HURST, GARY & SHREAVES, | ) | |
| A PROFESSIONAL CORPORATION | ) | |
| d/b/a KEITER CPA, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Flagstar Bank, FSB ("Plaintiff" or "Flagstar") brings this action against Keiter, Stephens, Hurst, Gary & Shreaves, A Professional Corporation, d/b/a Keiter CPA ("Defendant" or "Keiter") and alleges on knowledge as to its own acts, and on information and belief, including public filings, regarding all other facts, as follows:

### INTRODUCTION

1.      This complaint arises out of a massive, long-running fraud, and the fraudster's auditor Keiter's spectacular failure to detect that fraud over a period of almost five years, despite numerous opportunities to do so. From 2015 until the fraud collapsed in 2019, non-party Live Well Financial Inc. ("Live Well") fraudulently inflated the reported value of securities that represented the majority of its assets, and thereby portrayed itself as a thriving business, when in fact the portfolio of securities was worth a fraction of its claimed value, and Live Well was deeply insolvent. Live

Well purported to value these securities by obtaining prices from a purportedly reputable and independent third-party pricing service, but in reality, it had convinced the pricing service simply to accept Live Well's own inflated prices verbatim.  This fraudulent mispricing scheme was so brazen, it has led to multiple criminal convictions.[1]

2.      Despite auditing Live Well from the beginning to the end of the scheme, Keiter somehow failed to detect the fraud.  Far from uncovering the fraud, Keiter reinforced it by putting its stamp on annual financial statements that falsely represented that Live Well had hundreds of millions of dollars of "government bonds available for sale," and falsely portrayed Live Well as solvent because it had assets worth far more than its liabilities.

3.      To make matters worse, in the Reports of Independent Accountants that accompanied Live Well's financial statements, Keiter itself falsely stated that it had conducted its audits "in accordance with auditing standards generally accepted in the United States," and that the financial statements "present fairly, in all material respects, the financial position of" Live Well.

4.      In fact, Keiter's audits were woefully deficient, and as a result of those failures, Keiter was at least reckless as to whether the financial statements fairly presented Live Well's financial position.  Because of the substantial risk that the valuation of illiquid assets such as the bonds could be materially misstated, auditors are required to take reasonable steps to verify such valuations, the process used to determine them, and Live Well's internal controls concerning that

---

[1] *See*, *e.g*., Order, *United States v. Stumberger*, Case No. 19-cr-608 (S.D.N.Y. April 24, 2020) (accepting guilty plea); Indictment, *United States v. Hild*, Case No. 19-cr-602 (S.D.N.Y. filed Aug. 26, 2019) (hereinafter "Hild Indictment"); Jury Verdict, *Hild*, Case No. 19-cr-602 (S.D.N.Y. April 30, 2021) (noting jury finding of guilty on five charges); Information, *United States v. Rohr*, Case No. 19-cr-595 (S.D.N.Y. filed Aug. 23, 2019); *Former CEO of Live Well Financial Charged in $140 Million Bond Fraud Scheme*, Department of Justice, (Aug. 29, 2019), www.justice.gov/usao-sdny/pr/former-ceo-live-well-financial-charged-140-million-bond-fraud-scheme (indicating guilty plea); *see also* Complaint, *SEC v. Live Well Financial, Inc.*, Case No. 19-cv-8086 (S.D.N.Y. filed Aug. 29, 2019) (hereinafter "Hild Civil Complaint");  .

process.  And here, where the majority of Live Well's claimed asset value was concentrated in this one asset type, Keiter should have taken particularly robust measures to verify the valuations of those securities.

5.      Upon information and belief, Keiter's audits flouted the applicable requirements.  For example, as a matter of auditing standards and typical industry practice, Keiter should – and easily could – have compared the prices Live Well received from the pricing service with prices that were available from other pricing services.  If it had, it would have readily discovered a material difference from the valuation included in the financial statements.  This single step alone, a routine part of a standard auditing process in these circumstances, would have exposed the fraud.

6.      Keiter should also have evaluated the underlying inputs and methodologies that the pricing service used to generate those prices.  This standard process would have revealed that the pricing service was not providing independent valuations to Live Well, as it was supposed to do, but was simply accepting Live Well's own purported valuations without question.

7.      Exacerbating these failures, Keiter does not appear to have had the requisite valuation knowledge on its engagement team.  Under those circumstances, it was required by the accounting standards to hire a "specialist" in valuing securities of this type, but it did not do that either. Lacking this expertise, Keiter missed, or did not respond appropriately to, numerous red flags that the bonds were mis-valued, including suspiciously large round-number changes in the valuations.

8.      Keiter's failures became even more severe as Live Well's fraud became larger and bolder. Between 2015 and 2019, the purported value of Live Well's Bond portfolio ballooned dramatically, calling out for additional scrutiny by its auditors.  If Keiter had obtained even a basic understanding of the securities, it would have known that a valuation increase of that magnitude was not plausible, particularly since each individual bond was a wasting asset.

9.      Moreover, Live Well suffered a $33 million loss in the 2018 fiscal year, forcing it to sell certain assets in November 2018, and Live Well went bankrupt just months later.  Despite these developments, Keiter never disclosed any "going concern" issues with respect to Live Well; instead, Keiter's audits consistently concluded, without basis, that financial statements showing Live Well as a solvent entity were "fairly stated in all material respects…."

10.     Keiter is liable to plaintiff Flagstar for these failures.  Flagstar was a lender to Live Well, with an outstanding loan of approximately $70 million, secured by bonds that were represented to be worth more than $80 million.  In fact, the collateral was worth less than half that, and Live Well's liabilities were far greater than its assets.  As a result, after Live Well defaulted, Flagstar sold the bonds for only about $40 million, and suffered a loss of about $30 million.

11.     Before lending to Live Well, and annually while the credit facility was outstanding, Flagstar specifically required Live Well to provide CPA-audited financial statements, which Flagstar reviewed and relied upon.  As a result, Flagstar reasonably believed that the financial statements had been audited according to the applicable standards, and that they fairly represented not only that Live Well was a solvent borrower with the ability to repay its debts, but also that even if Live Well defaulted, Flagstar was fully collateralized by Live Well's bonds.

12.     As Live Well's long-time auditor, Keiter surely was aware that Live Well was borrowing from financial institutions including Flagstar, that Live Well was posting the bonds as collateral for those loans, and accordingly that those lenders, again including Flagstar, were relying on the financial statements audited by Keiter as part of their diligence for those loans.

13.     To recover the remainder of its $30 million in losses from the scheme, Flagstar brings claims against Keiter for fraud, aiding and abetting Live Well's fraud, and negligent misrepresentation.

## THE PARTIES

14.    Plaintiff Flagstar is a federally charted savings bank with a principal place of business located at 5151 Corporate Drive, Troy, Michigan 48098.

15.    Defendant Keiter, an accounting and consulting firm that provides financial auditing, tax, and other consulting services to clients such as Live Well, is a Professional Corporation incorporated under the laws of the Commonwealth of Virginia, and its principal place of business and address of incorporation is 4401 Dominion Boulevard, Glen Allen, Virginia 23060.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy is more than $75,000.00.

17.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b), 1391(d), because this is the district and division where a substantial part of the events occurred and where Defendant has sufficient contacts to subject it to personal jurisdiction.

## FACTUAL ALLEGATIONS

**The Live Well Scheme to Falsify the Valuations of the Bonds**

18.    Third party Live Well is a Virginia-based corporation that was in the business of originating and servicing reverse mortgages.  In the months prior to its failure, Live Well was regularly one of the highest-volume originators of reverse mortgages in the country.

19.    Beginning in 2014, Live Well acquired a bond portfolio comprised of HECM interest-only bonds (the "Bonds").[2]  The Bonds were backed by interest-only strips of specified pools of reverse

---

[2] Hild Civil Complaint ¶ 31.  HECM stands for Home Equity Conversion Mortgage.  HECMs are a type of reverse mortgage insured by the Federal Housing Administration.  Interest-only strips are bonds which entitle the holder to the interest payments on the underlying reverse mortgages.

mortgages issued by the Government National Mortgage Association and insured by the federal government.

20.     Live Well used the Bonds to raise money by entering into repo agreements (agreements to sell and subsequently repurchase the bonds) or secured loans with various lenders, in which the Bonds served as collateral.[3]

21.     In order to use the Bonds as collateral for loans, the Bonds needed to be valued.  But because the Bonds were thinly traded, market prices were not readily available for them.  Instead, at least as early as 2015, Live Well entered into an agreement with a third-party pricing service to provide prices for Live Well's portfolio of Bonds.[4]  Pricing services typically value thinly traded assets either by using financial models to determine the present value of their expected cash flows, or by surveying market participants to try to obtain market quotations for the asset, notwithstanding that they do not trade as frequently as, for example, securities listed on exchanges.

22.     Here, the pricing service agreed to publish Live Well's own, higher quotes to price the Bonds, rather than prices calculated or obtained independently by the pricing service itself.[5] According to a contemporaneous email quoted in the SEC Complaint against Live Well and certain of its executives, the pricing service agreed at that time that it "will use [Live Well's] prices verbatim and not model these bonds until we are interested in them doing so."[6]

23.     Live Well then grossly inflated the value of its portfolio, allowing it to borrow more money backed by the fraudulently inflated collateral.  Primarily as a result of this fraud, the claimed value

---

[3] Hild Civil Complaint ¶ 33.
[4] *Id.* ¶ 41.
[5] *Id.* ¶ 50.
[6] Hild Indictment ¶¶ 27-28.

of Live Well's bond portfolio grew from $71 million in September 2015 to $324 million in May 2016 – nearly 5 times – with only minor additional acquisitions.[7]

24.     At times, Live Well's frauds were particularly brazen. As detailed in the criminal indictment filed against Live Well's former CEO, on at least two occasions, Live Well sent the pricing service valuations reflecting price increases that were "simply round number increases across a group of bonds, untethered to any analysis."[8]

25.     These changes were obviously driven not by any change in market conditions, but rather by Live Well's need to use the Bonds to generate immediate cash.  As the CEO of Live Well explained in another email, it was "a self-generating money machine."[9]

**The Flagstar-Live Well Credit Facility**

26.     Flagstar was one of the lender victims of Live Well's "self-generating money machine."

27.     As of March 29, 2017, Live Well and Flagstar entered into a Loan and Security Agreement (the "Credit Facility") secured by the Bonds.  Under the terms of the Credit Facility, Flagstar originally agreed to lend $50 million to Live Well.

28.     In or about October 2017, the loan amount was increased to $70 million.

29.     To protect Flagstar from the risk of default, the Credit Facility provided that the amount outstanding on the loan could not exceed 80% of the "market value" of the Bonds.  This 80% loan-to-value ratio protected Flagstar from price fluctuations or small price discrepancies in the event that Live Well defaulted, and Flagstar needed to sell the collateral to obtain payment.

---

[7] Hild Civil Complaint ¶ 120.
[8] Hild Indictment ¶ 39.
[9] *Id.* ¶ 36.

30.     The Credit Facility further provided that the market value of the Bonds would be determined by an independent third-party pricing service.  Thus, in entering into the Credit Facility with Live Well, Flagstar was relying on the value of the portfolio, as audited by Keiter.

**Flagstar's Reliance on Live Well's 2015-2018 Financial Statements**

31.     As a precondition to entering into the Credit Facility, Flagstar required Live Well to provide audited annual financial statements, which it originally received for the years ending 2015 and 2016.

32.     Thereafter, as a condition to continuing the Credit Facility each year, Flagstar required Live Well to provide updated audited annual financial statements for the years ending 2017 and 2018 (together with the 2015 and 2016 financial statements, the "Financial Statements").

33.     All the Financial Statements reported that Live Well had substantial shareholders' equity, meaning that it was a solvent company with ample ability to repay its debts.

34.     The largest asset on Live Well's balance sheet by far was the Bonds.  In particular, the Financial Statements also reported that a high proportion of Live Well's reported asset value was attributable to the Bonds, that the Bonds did not have readily available market prices, and accordingly that the Bonds were valued using a third-party pricing service.

35.     Live Well's purported solvency, and the claimed valuations of the Bonds, were false, and corroborated other false information that Flagstar had received from Live Well.

36.     Live Well issued the Financial Statements for the year ending December 31, 2018 on or about March 28, 2019.  Those Financial Statements noted that Live Well had suffered a significant loss on its sale of mortgage servicing rights, but nothing in the Financial Statements even hinted that Live Well was in danger of going bankrupt just a few months later.

**Flagstar's Reliance on Keiter's Reports of Independent Accountants**

37.     Each set of Financial Statements also includes a Report of Independent Accountants prepared by Keiter.  In each Report of Independent Accountants, Keiter stated that it "conducted our audits in accordance with auditing standards generally accepted in the United States…. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement."

38.     Further, in the Opinion section of each Report of Independent Accountants, Keiter stated that "[i]n our opinion, the financial statements referred to above present fairly, in all material respects, the financial operations of Live Well Financial, Inc. as of [the relevant year-end dates], and the results of its operations, changes in stockholders' equity, and its cash flows for the year[s] then ended in accordance with accounting principles generally accepted in the United States."

39.     In addition, for 2015 and 2016, Keiter issued a report on its "consideration of the Company's internal control over financial reporting…."  In that report, Keiter stated that "[w]e did not identify any deficiencies in internal control that we consider to be material weaknesses," and also that "[w]e did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses."[10]

40.     More generally, Keiter held itself out to the public as providing independent auditing services based on "generally accepted auditing standards."[11]  It describes its auditing service as the

---

[10] In its 2017 and 2018 audits, Keiter similarly represented to have "consider[ed] internal control relevant to [Live Well's] preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances."
[11] "Audit, Review & Compilation," Keiter, https://keitercpa.com/services/assurance/audit-review-compilation/ (last accessed August 12, 2021).

highest level of assurance the company offers, and describes its "professional goal and obligation" as "provid[ing] assurance that [a client's] financial statements are accurate and reliable."[12]

41.     In extending credit to Live Well over a period of years, Flagstar relied both on the Financial Statements themselves, and also on Keiter's statements in the Reports of Independent Accountants that it had audited Live Well's Financial Statements in accordance with generally accepted auditing standards; that the Financial Statements showing Live Well's solvency, and the inflated value of its Bonds, fairly presented its financial condition; and that Live Well did not have any material internal control deficiencies.

**The Generally Accepted Standards for Auditing Prices for Level 2 Assets**

42.     The statements by Keiter in the Reports of Independent Accountants were false, because Keiter did not audit the Financial Statements in accordance with generally accepted standards in the United States, and accordingly it did not determine whether the Financial Statements in fact fairly presented Live Well's financial position or whether Live Well had any material internal control deficiencies.

43.     Financial assets are valued using a three-level hierarchy of methodologies.  As the Notes to the Financial Statements explained,

>    a.   Level 1 assets, the most liquid assets for which the most reliable market prices are available, are valued using "[u]nadjusted quoted prices that are available in active markets on major exchanges…"  Level 1 assets include, for example, securities traded on major exchanges.

>    b.   Level 2 assets, which are less frequently traded than Level 1 assets and thus do not have readily available quoted market prices, are valued using "[q]uoted prices for

---

[12] *Id.*

similar instruments in active and inactive markets; and model driven valuations

with significant inputs and drivers derived from observable active markets."

    c.   Level 3 assets are the most illiquid assets, which are valued using "[u]nobservable

inputs that cannot be corroborated by observable market data and reflect the use of

significant management judgment…."

44.    The Notes to all the Financial Statements disclosed that Live Well's "Government bonds

available for sale" were "classified within Level 2 of the valuation hierarchy," meaning they were

illiquid assets for which observable market prices were not readily available.  The Notes further

disclosed that Live Well "carries these securities at fair value derived from an independent third-

party pricing source that provides daily price quotes; which are specific to each bond CUSIP.  This

pricing service is also utilized by other industry participants to determine collateral values and

active trades on bonds."

45.    AU-C 540, published by the American Institute of CPAs, sets forth the accounting

standards applicable to an auditor like Keiter when auditing "accounting estimates, including fair

value accounting estimates" for assets for which observable market prices are not available, such

as the Bonds.[13]

46.    Under AU-C 315.03, the objective of an audit authority "is to identify and assess the risks

of material misstatement, whether due to fraud or error, at the financial statement and relevant

assertion levels through understanding the entity and its environment."[14] The standards require

particular risk assessment procedures with respect to auditing accounting estimates, with special

---

[13] American Institute of Certified Public Accountants (AICPA), *Clarified Statements on Auditing Standards* (hereinafter "AU-C") § 540.

[14] AU-C § 315.03.

attention to the entity's internal controls that may present risk of material misstatement of the fair value of assets such as the Bonds.[15]

47.     An accounting estimation may have "high estimation uncertainty" where it is a "[f]air value account estimate[] for which a highly specialized, entity-developed model is used or for which there are no observable inputs."[16]   The auditor must then use its "professional judgment" to determine whether "any of those accounting estimates that have been identified as having high estimation uncertainty give rise to significant risks."[17]

48.     In addition, the auditor "should consider whether specialized skills or knowledge with regard to one or more aspects of the accounting estimates is required in order to obtain sufficient appropriate audit evidence."[18]   This may require the engagement of an "auditor's specialist" if the auditor does "not possess the specialized skills or knowledge required."[19]

49.     A part of that process is to consider "whether management has used a specialist,"[20] such as the pricing service employed by Live Well.   In considering the input of a specialist, the auditor "should, to the extent necessary . . . evaluate the competence, capabilities, and objectivity of that specialist," and "obtain an understanding of the work of that specialist," and with that understanding "evaluate the appropriateness of that specialist's work as audit evidence for the relevant assertion."[21]

---

[15] AU-C § 540.08 (requiring assessment of, among other things, how the company "makes accounting estimates and the data on which they are based," which will include reviewing "the method(s), including, when applicable, the model, used in making the accounting estimate" and "the assumptions underlying the accounting estimates.").

[16] AU-C § 540.A47.

[17] AU-C § 540.11.

[18] AU-C § 540.12.

[19] AU-C § 540.A105.

[20] AU-C § 540.08(c)(iii).

[21] AU-C § 500.08.

50.     Thus, Keiter was not entitled to rely simply on the valuations provided by the pricing service used by Live Well; rather, Keiter was required to understand the pricing service's work – i.e., how it actually determined or obtained the valuations used by Live Well – as well as whether there was adequate underlying evidence to support those valuations.

51.     In sum, pursuant to the applicable standards, and as a matter of industry practice, Keiter should have audited the valuations of the Bonds by taking some or all of the following steps:

   a.  Reviewing information concerning the pricing service's valuation techniques, inputs, and controls;

   b.  Reviewing Live Well's receipt of valuations from the pricing service, and its internal controls with respect to that process, to assess the reliability of that process;

   c.  Reviewing the pricing service's own process and controls;

   d.  Obtaining prices from other third-party pricing sources to evaluate whether the prices from Live Well's chosen pricing service were reasonable;

   e.  Developing its own point estimate or range to evaluate the reasonableness of the valuations received from the pricing service;

   f.  Reviewing any "subsequent reestimation" of the valuations,[22] using "professional skepticism" to uncover the likelihood of bias in the entity's estimation.[23]

52.     In addition, AU-C 620 provides that when an auditor does not have sufficient expertise on its own to conduct some or all of these procedures, it may retain a specialist to assess, among other things, the "valuation of complex financial instruments and nonfinancial assets and liabilities."[24]

---

[22] AU-C § 540.09.
[23] AU-C § 540.A40.
[24] AU-C § 620.A1.

53.     In cases where an entity has a majority of its asset value tied up in a single type of asset, let alone assets valued by a pricing service, the risk of a material misstatement is particularly high. As a result, in these circumstances, a prudent auditor would (and should) have applied these standards rigorously and robustly.

**Keiter's Audit Failures**

54.     Keiter obviously did not take reasonable steps to audit Live Well's (and the pricing service's) valuations, let alone rigorous steps, because any reasonable audit would have readily determined, among other things, the huge discrepancy between the prices reported by Live Well and the actual values of the bonds (including values contemporaneously reported by other pricing services), the irregular round-number adjustments made to the valuations, and the lack of any underlying basis for the valuations provided by the pricing service.  Moreover, a reasonable audit also would have detected that Live Well was on the verge of bankruptcy in March 2019, when Live Well issued, and Keiter completed its audit, of Live Well's Financial Statements for the year ending December 31, 2018.

55.     In fact, upon information and belief, Keiter did not detect Live Well's fraud because Keiter violated each of the standards and industry practices set forth above.

56.     For example, upon information and belief, and contrary to the AICPA standards discussed above, Keiter did not actually review the work conducted by Live Well's pricing service, the inputs into the valuations provided by that pricing service, or the changes in those valuations over time. If it had, it would have discovered, among other things, that the pricing service was receiving the prices _**from**_ Live Well, rather than determining them independently and providing them _**to**_ Live Well, as it was supposed to do.  It also would have discovered the obviously improper round

number adjustments made to groups of Bonds, unsupported by any evidence that the individual Bonds had appreciated to specific values.

57.     Second, Keiter obviously did not obtain prices from a pricing service other than the one retained by Live Well, because if it had, it would have immediately determined that Live Well's prices varied significantly from those prices, raising the potential for fraud or material misstatement.

58.     Third, again upon information and belief, Keiter did not "develop[] a point estimate or range to evaluate management's point estimate."[25]  If Keiter had taken even the most basic steps to understand and value the Bonds, it would have realized the value reported in the Financial Statements was inaccurate.

59.     Finally, also upon information and belief, Keiter did not retain a specialist to assist it, notwithstanding that it plainly lacked the expertise to audit the prices of Level 2 securities.

60.     Because Keiter's audits violated generally accepted accounting standards, its statements in the Reports of Independent Accountants were false.  These false statements corroborated and lent support to the false statements in the Financial Statements themselves.

**Flagstar's Loss**

61.     On or about May 4, 2019, Live Well ceased doing business, and on or about June 10, 2019, Flagstar and other creditors filed an involuntary petition for bankruptcy.[26]

62.     As of June 2019, there was $68,285,685.86 in principal and $134,415.09 in interest outstanding on the Credit Facility.

---

[25] AU-C § 540.A93.
[26] Chapter 7 Involuntary Petition, *In re Live Well Financial, Inc.*, Case No. 19-bk-11317 (Bankr. D. Del. filed June 10, 2019).

63.     In or around September 2019, Flagstar obtained relief from the automatic stay in the bankruptcy which entitled it to take control of the Bonds.  Flagstar thereafter received three interest payments from the Bonds totaling approximately $3 million and ultimately sold the Bonds for approximately $35 million, obtaining a total value of $38,553,780.38**.**

64.     As a result, Flagstar was damaged in the amount of $30,088,275.85, the amount outstanding on the loan and Flagstar's expenses in obtaining and liquidating the Bonds, less the actual market value of the Bonds as reflected in the sale.

65.     Thereafter, Flagstar recovered certain amounts from other parties, and currently has an outstanding loss in excess of $10 million.

## COUNT ONE

### (Fraud)

66.     Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 65 as if fully set forth herein.

67.     In the Report of Independent Accountants that accompanied each of the Financial Statements, Keiter knowingly and intentionally stated that the Financial Statements "present fairly, in all material respects, the financial position of Live Well Financial, Inc. as of [the relevant year-end date], and the results of its operations, changes in stockholders' equity, and its cash flows for the year[s] then ended in accordance with accounting principles generally accepted in the United States."

68.     This statement was false in at least three respects.  First, because the value of Live Well's Bonds was massively inflated by as much as hundreds of millions of dollars, and as such the Financial Statements did not "present fairly" Live Well's financial position.  Second, because the Financial Statements represented that Live Well had a positive shareholders' equity, when in fact

it was deeply insolvent.  And third, because Keiter had not conducted its audit "in accordance with accounting principles generally accepted in the United States."

69.     The false representations made by Keiter were material because a lender like Flagstar would have wanted to know whether the audit was conducted properly and in accordance with generally accepted accounting principles, and whether the audit fairly represented Live Well's solvency and the true value of its largest group of assets.

70.     Upon information and belief, Keiter knew or had reason to know that Live Well's lenders (including Flagstar) were relying on its material misrepresentations and intended for lenders (including Flagstar) to rely on them.

71.     Keiter made the false statements with intent to defraud, in that it was at least reckless as to the truth or falsity of its statements in the audit.

72.     Flagstar reasonably relied on Keiter's material, false representations, by extending credit to Live Well based on the mistaken beliefs that Keiter had audited the Financial Statements in accordance with the applicable standards, and that the Financial Statements fairly represented that Live Well was solvent and that Flagstar was fully secured.

73.     As a direct and proximate result of Keiter's material, false representations, and Flagstar's reasonable reliance on those material, false representations, Flagstar was damaged in an amount to be determined at trial, but currently believed to be at least $10 million.

## COUNT TWO

### (Aiding and Abetting Fraud)

74.     Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 65 as if fully set forth herein.

75.     On numerous occasions at the outset of, and during the course of, the Live Well-Flagstar lending relationship, Live Well made false statements to Flagstar concerning the value of its Bonds and concerning its own financial wherewithal and solvency.  These false statements were made in numerous documents provided to Flagstar, including but not limited to the Financial Statements.

76.     The Financial Statements in particular were false in that they falsely valued Live Well's Bonds, and falsely stated that Live Well was solvent, when in fact its Bonds were worth far less than represented, and the company was deeply insolvent at all relevant times.

77.     Flagstar reasonably relied on Live Well's material, false representations, by extending credit to Live Well based on the mistaken beliefs that Live Well was solvent and that, in any event, Flagstar was fully secured.

78.     Upon information and belief, Keiter knew that the Financial Statements supplied by Live Well were fraudulent.

79.     Keiter provided substantial assistance to Live Well's fraud by falsely representing that Live Well's Financial Statements, which prominently included the aggregate value of the Bonds, "fairly represented" Live Well's financial condition, and by falsely representing that it had conducted the audits in accordance with generally accepted accounting principles.  Without the imprimatur of Keiter's purportedly independent audit, the fraud would not have been successful, because Flagstar would not have agreed to lend Live Well money without third party, independent verification.

80.     As a direct and proximate result of Keiter's aiding and abetting Live Well's fraud, Flagstar was damaged in an amount to be determined at trial, but currently believed to be at least $10 million.

## COUNT THREE

### (Negligent Misrepresentation)

81.     Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 65 as if fully set forth herein.

82.     In the Report of Independent Accountants that accompanied each of the Financial Statements, Keiter falsely stated that the Financial Statements "present fairly, in all material respects, the financial position of Live Well Financial, Inc. as of [the relevant year-end date], and the results of its operations, changes in stockholders' equity, and its cash flows for the year[s] then ended in accordance with accounting principles generally accepted in the United States."

83.     This statement was false in at least three respects.  First, because the value of Live Well's Bonds was massively inflated by as much as hundreds of millions of dollars, and as such the Financial Statements did not "present fairly" Live Well's financial position.  Second, because the Financial Statements represented that Live Well had a positive shareholders' equity, when in fact it was deeply insolvent.  And third, because Keiter had not conducted its audit "in accordance with accounting principles generally accepted in the United States."

84.     The false representations made by Keiter were material because a lender like Flagstar would have wanted to know whether the audit was conducted properly and in accordance with generally accepted accounting principles, and whether the audit fairly represented Live Well's solvency and the true value of its largest group of assets.

85.     Upon information and belief, Keiter knew or had reason to know that Live Well's lenders (including Flagstar) were relying on its material misrepresentations and intended for lenders (including Flagstar) to rely on them.

86.     Keiter made these false statements at least negligently, because it did not conduct the audits in accordance with generally accepted accounting principles and did not take adequate or reasonable steps to verify that Live Well's Bonds were reasonably valued.

87.     Flagstar reasonably relied on Keiter's material, false representations, by extending credit to Live Well based on the mistaken beliefs that Keiter had audited the Financial Statements in accordance with the applicable standards, and that the Financial Statements fairly represented that Live Well was solvent and that Flagstar was fully secured.

88.     As a direct and proximate result of Keiter's material, false representations, and Flagstar's reasonable reliance on those material, false representations, Flagstar was damaged in an amount to be determined at trial, but currently believed to be at least $10 million.

## JURY DEMAND

89.     Flagstar demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.       For an award of damages in an amount to be determined at trial, but currently believed to be at least $10 million.

2.       For punitive damages.

3.       For prejudgment and post-judgment interest.

4.       For plaintiff's costs and reasonable attorneys' fees.

5.       For such other relief as the Court may deem just and proper.


Dated: September 1, 2021

Respectfully submitted,

/s/ Jeri K. Somers

Jeri K. Somers

VA Bar No. 25987
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Telephone: 202-639-6000
JSomers@jenner.com

Stephen L. Ascher (*pro hac vice* forthcoming)
Andrew C. Elliott
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699
sascher@jenner.com

*Attorneys for Flagstar*