

Financial Statements

December 31, 2016 and 2015

EXHIBIT

B

**LIVE WELL FINANCIAL, INC.**

Table of Contents

|                                                                          | Page |
|--------------------------------------------------------------------------|-----:|
| Report of Independent Accountants                                        | 1    |
| Financial Statements:                                                    |      |
|     Statements of Financial Condition                | 3    |
|     Statements of Operations                         | 4    |
|     Statements of Stockholders' Equity               | 5    |
|     Statements of Cash Flows                         | 6    |
|     Notes to Financial Statements                    | 8    |
| Supplemental Information:                                                 |      |
|     Schedule of Adjusted Net Worth Computation – FHA Title II Lenders | 32 |
|     HUD Financial Data Templates                     | 33   |
|     Ginnie Mae Issuer No. 4174:                      |      |
|         Schedule of Adjusted Net Worth Calculation | 36 |
|         Schedule of Capital Requirement Calculation | 37 |
|         Schedule of Liquid Asset Requirement Calculation | 38 |
|         Schedule of Insurance Requirement | 39 |
|         Required Transmittals/Checklists for Annual Submission of Financial Documents | 40 |
|     Ginnie Mae Issuer No. 4224:                      |      |
|         Schedule of Adjusted Net Worth Calculation | 41 |
|         Schedule of Capital Requirement Calculation | 42 |
|         Schedule of Liquid Asset Requirement Calculation | 43 |
|         Schedule of Insurance Requirement | 44 |
|         Required Transmittals/Checklists for Annual Submission of Financial Documents | 45 |
| Report of Independent Accountants on Internal Control over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with *Government Auditing Standards* | 46 |
| Report of Independent Accountants on Compliance with Requirements That Could Have A Direct and Material Effect on Each Major HUD-Assisted Program and on Internal Control Over Compliance in Accordance with *Consolidated Audit Guide for Audits of HUD Programs* | 48 |
| Schedule of Findings, Questioned Costs, and Recommendations | 51 |
| Schedule of the Status of Prior Audit Findings, Questioned Costs, and Recommendations | 52 |
| Corrective Action Plan | 53 |



## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Stockholders
Live Well Financial, Inc.
Richmond, Virginia

**Report on the Financial Statements**

We have audited the accompanying financial statements of Live Well Financial, Inc. (the "Company"), which comprise the statements of financial condition as of December 31, 2016 and 2015, and the related statements of operations, stockholders' equity, and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits.  We conducted our audits in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards,* issued by the Comptroller General of the United States.  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.  The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Certified Public Accountants & Consultants**
4401 Dominion Boulevard
Glen Allen, VA 23060
T:804.747.0000  F:804.747.3632

www.keitercpa.com

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Live Well Financial, Inc. as of December 31, 2016 and 2015, and the results of its operations, changes in stockholders' equity, and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States.

**Report on Supplemental Information**

Our audits were conducted for the purpose of forming an opinion on the financial statements as a whole.  The accompanying supplemental information on pages 32 through 45 and pages 50 through 51, as listed in the Table of Contents, is presented for purposes of additional analysis as required by the *Consolidated Audit Guide for Audits of HUD Programs (*the *"Guide")*, issued by the U.S. Department of Housing and Urban Development, Office of Inspector General, and is not a required part of the financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States.  In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued a report dated March 31, 2017 on our consideration of the Company's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements, and other matters.  The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance.   That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Company's internal control over financial reporting and compliance.

*Keiter*

March 31, 2017
Glen Allen, Virginia

**LIVE WELL FINANCIAL, INC.**

Statements of Financial Condition
December 31, 2016 and 2015

| Assets | 2016 | 2015 |
|---|---|---|
| Cash and cash equivalents | $ 80,673,178 | $ 33,572,882 |
| Restricted cash | 1,300,000 | 1,250,000 |
| Loans held for sale, at fair value | 77,009,210 | 87,059,385 |
| Mortgage servicing rights, net | 100,523,084 | 85,500,144 |
| Government bonds available for sale | 520,368,332 | 217,859,066 |
| Government bonds interest receivable | 5,769,243 | 4,226,408 |
| Reverse repurchase agreements at fair value, net | (11,006) | 250,740 |
| HUD loans held | 14,662,315 | 9,529,247 |
| Income taxes receivable | 1,080,152 | 4,070,349 |
| Prepaid expenses | 1,107,399 | 630,980 |
| Property and equipment, net | 26,645 | 74,846 |
| Loan commitments, at fair value | 576,508 | (54,358) |
| Other assets | 3,985,228 | 1,035,259 |
| Total assets | $ 807,070,288 | $ 445,004,948 |

| Liabilities and Stockholders' Equity | | |
|---|---|---|
| Liabilities: | | |
| Lines of credit | $ 524,355,420 | $ 286,748,849 |
| Subordinated notes payable | 11,000,000 | - |
| Notes payable | 200,000 | - |
| Accounts payable and accrued expenses | 77,199,741 | 35,305,961 |
| Loss reserve | 32,946,461 | 11,686,137 |
| Deferred income taxes | 68,318,078 | 37,765,287 |
| Total liabilities | 714,019,700 | 371,506,234 |
| Stockholders' equity: | | |
| Series A preferred stock | - | 10,008,419 |
| Common stock | 926,500 | 926,500 |
| Capital in excess of stated value | 2,437,628 | 2,228,096 |
| Accumulated equity | 89,686,460 | 60,335,699 |
| Total stockholders' equity | 93,050,588 | 73,498,714 |
| Total liabilities and stockholders' equity | $ 807,070,288 | $ 445,004,948 |

See accompanying notes to financial statements.

**LIVE WELL FINANCIAL, INC.**

Statements of Operations
Years Ended December 31, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| Revenues: | | |
| Gain on mortgage loan originations | $ 38,054,577 | $ 30,968,592 |
| Mortgage origination fees | 3,461,634 | 4,185,520 |
| Total origination income | 41,516,211 | 35,154,112 |
| Servicing income | 25,727,157 | 19,017,982 |
| Interest income | 43,031,727 | 16,522,567 |
| Gain on investments available for sale | 76,277,766 | 47,066,736 |
| Total interest income and net investment gains | 119,309,493 | 63,589,303 |
| Net revenues | 186,552,861 | 117,761,397 |
| Expenses: | | |
| General and administrative expenses: | | |
| Marketing expenses | 8,857,158 | 9,624,796 |
| Operating expenses | 15,473,455 | 12,563,329 |
| Wages and benefits | 22,890,776 | 23,341,292 |
| Total general and administrative expenses | 47,221,389 | 45,529,417 |
| Provision for loan losses | 23,116,899 | 3,323,813 |
| Interest expense | 15,086,371 | 7,680,140 |
| Amortization of mortgage servicing rights | 23,441,334 | 16,364,267 |
| Depreciation and amortization | 48,201 | 88,724 |
| Net expenses | 108,914,194 | 72,986,361 |
| Income before income taxes | 77,638,667 | 44,775,036 |
| Income tax expense | (29,296,325) | (17,014,513) |
| Net income | $ 48,342,342 | $ 27,760,523 |

See accompanying notes to financial statements.

**LIVE WELL FINANCIAL, INC.**

Statements of Stockholders' Equity
Years Ended December 31, 2016 and 2015

| | Series A Preferred Stock | | Common Stock | | Capital in Excess of Stated Value | Accumulated Equity | Total |
|---|---|---|---|---|---|---|---|
| | No. Shares | Amount | No. Shares | Amount | | | |
| Balance, January 1, 2015 | 1,784 | $ 10,008,419 | 1,853 | $ 926,500 | $ 2,018,564 | $ 32,575,176 | $ 45,528,659 |
| Net income | - | - | - | - | - | 27,760,523 | 27,760,523 |
| Stock compensation | - | - | - | - | 209,532 | - | 209,532 |
| Balance, December 31, 2015 | 1,784 | 10,008,419 | 1,853 | 926,500 | 2,228,096 | 60,335,699 | 73,498,714 |
| Net income | - | - | - | - | - | 48,342,342 | 48,342,342 |
| Stock compensation | - | - | - | - | 209,532 | - | 209,532 |
| Redemption of preferred stock | (1,784) | (10,008,419) | - | - | - | (18,991,581) | (29,000,000) |
| Balance, December 31, 2016 | - | $ - | 1,853 | $ 926,500 | $ 2,437,628 | $ 89,686,460 | $ 93,050,588 |

See accompanying notes to financial statements.

5

**LIVE WELL FINANCIAL, INC.**

Statements of Cash Flows
Years Ended December 31, 2016 and 2015

| | 2016 | 2015 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | $ 48,342,342 | $ 27,760,523 |
| Adjustments to reconcile net income to net cash from operating activities: | | |
| Proceeds from securitizations/sales of mortgage loans | 677,569,014 | 777,234,663 |
| Originations/purchases of mortgage loans held for sale | (678,479,619) | (827,538,784) |
| Loss on mortgage assets | 9,007,134 | 765,779 |
| Change in future net servicing income | (34,892,747) | (37,564,834) |
| Amortization of future net servicing income | 18,707,094 | 16,364,267 |
| Impairment charge on future net servicing income | 4,734,240 | 3,821,376 |
| Unrealized (gains) losses on loan commitments | (630,866) | 323,076 |
| Realized/unrealized gains on government bonds | (85,571,975) | (47,066,736) |
| Realized/unrealized losses on reverse repurchase agreements | 9,294,209 | 1,046,962 |
| Provision for loan losses | 23,213,970 | 4,133,813 |
| Depreciation and amortization | 48,201 | 88,724 |
| Deferred income tax expense | 30,552,791 | 21,319,934 |
| Stock-based compensation | 209,532 | 209,532 |
| Changes in: | | |
| Unsecuritized servicing balances | (3,582,062) | (6,828,510) |
| Loan servicing receivables | 10,535 | 378,091 |
| Government bonds interest receivable | (1,542,835) | (3,099,135) |
| HUD loans held | (5,133,068) | (8,806,991) |
| Income taxes receivable | 2,990,197 | (3,654,121) |
| Prepaid expenses and other assets | (3,426,388) | (993,673) |
| Accounts payable and accrued expenses | 41,893,780 | 16,550,338 |
| Net cash provided by (used in) operating activities | 53,313,479 | (65,555,708) |
| | | |
| Cash flows from investing activities: | | |
| Change in restricted cash | (50,000) | (650,000) |
| Purchase of government bonds | (216,937,291) | (142,471,755) |
| Proceeds from sale of government bonds | - | 22,375,328 |
| Net cash used in investing activities | (216,987,291) | (120,746,427) |
| | | |
| Cash flows from financing activities: | | |
| Payments on lines of credit | (1,039,525,284) | (1,366,992,648) |
| Proceeds from lines of credit | 1,277,131,855 | 1,565,924,085 |
| Purchase of securities under agreements to resell | (9,032,463) | (1,297,702) |
| Proceeds from issuance of notes payable | 200,000 | - |
| Payments on preferred stock redemption | (18,000,000) | - |
| Net cash provided by financing activities | 210,774,108 | 197,633,735 |

See accompanying notes to financial statements.

6

**LIVE WELL FINANCIAL, INC.**

Statements of Cash Flows, Continued
Years Ended December 31, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| Net increase in cash and cash equivalents | $ 47,100,296 | $ 11,331,600 |
| Cash and cash equivalents, beginning of year | 33,572,882 | 22,241,282 |
| Cash and cash equivalents, end of year | $ 80,673,178 | $ 33,572,882 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 15,086,371 | $ 7,680,140 |
| Cash refunded during the year for income taxes | $ (4,258,904) | $ (469,983) |
| | | |
| Supplemental disclosure of noncash transactions: | | |
| Issuance of notes payable for redemption of preferred stock | $ 11,000,000 | $ - |

See accompanying notes to financial statements.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements

**1.     Summary of Significant Accounting Policies:**

**Nature of Business:**  Live Well Financial, Inc. (the "Company") was incorporated on April 1, 2005, and is headquartered in Richmond, Virginia.  The Company operates principally as a mortgage lender and investor in bonds issued by the Government National Mortgage Association ("GNMA").  Since its organization, the Company has devoted substantial financial resources to obtaining licensing from federal and state regulatory authorities, developing a proprietary retail, wholesale lending and correspondent platform, developing servicing and secondary marketing capabilities, and building a network of wholesale brokers and correspondents across the United States. The Company has established physical branch offices in San Diego, California; Kihei, Hawaii; and Richmond, Virginia to expand their retail and wholesale businesses.  By law, the Company has authorized branches in Pahoa, Hawaii and Scottsdale, Arizona.  At December 31, 2016, the Company was doing business in 47 states, Washington, D.C. and Puerto Rico, employed 196 people, and established relationships with over 456 wholesale brokers and 34 correspondent lenders.   During 2014, the Company established a Government Bond trading desk to manage the secondary market activities related to the sale of HMBS. Additionally, the trading desk manages the Government Bond Portfolio that the Company holds for sale on its balance sheet along with the related hedges and debt financing.

In 2007, the Company became an approved seller and servicer of home equity conversion mortgages ("HECM") to the Federal National Mortgage Association ("FNMA").  The Company has not sold new HECM loans to FNMA since 2009; however continues to service a portfolio of existing HECM loans on behalf of FNMA.

In February 2012, the Company was approved by the GNMA to issue and sell home equity conversion mortgage ("HECM") mortgage-backed securities ("HMBS").   The Company issued and sold 128 and 127 HMBS pools collateralized by HUD-approved reverse mortgages participations originated by the Company or purchased from other lenders in 2016 and 2015, respectively.

In March 2013, the Company was approved by GNMA to issue and sell Ginnie Mae I and II single family forward mortgage mortgage-backed securities ("MBS").   The Company issued and sold 21 and 10 MBS pools collateralized by HUD-approved forward mortgages originated by the Company or purchased from other lenders in 2016 and 2015, respectively.

In September 2013, the Company became an approved seller and servicer of conforming forward mortgages directly to FNMA on a whole loan basis.

The Company is exposed to a number of risks, including competition, the fluctuations in the value of residential real estate owned by potential borrowers, secondary market conditions, and implementation risk of new lending programs and programmatic changes to existing federal lending programs, and other innovations.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1.     **Summary of Significant Accounting Policies, Continued:**

**Nature of Business, Continued:**  Through 2016, management was able to finance the Company's operations and expansion through earnings, the issuance of debt instruments, and preferred and common stock.  Since inception through December 31, 2016, the Company has raised equity capital totaling $12,338,000.  The Company has not raised equity capital since 2008.

**Basis of Accounting:**  The accompanying consolidated financial statements have been prepared on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States ("GAAP") as determined by the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC").

**Revenue Recognition:**

*Fair Value Option*:  Under the guidance issued by FASB for the fair value option for financial assets and financial liabilities (the "Fair Value Option"), the Company is permitted to choose, at specified election dates, to measure eligible items at fair value.  Unrealized gains and losses on items for which the Fair Value Option has been elected are reported in operations as a component of gain on mortgage loan originations.  Additionally, fees and costs associated with instruments for which the Fair Value Option is elected are recognized as earned and expensed as incurred, rather than deferred.  The Fair Value Option is applied instrument-by-instrument (with certain exceptions), is irrevocable (unless a new election date occurs), and is applied only to an entire instrument.

The Company measures certain eligible items at fair value, including all of its loans held for sale ("LHFS") and approved loan commitments at each election date.  The Company's fair value election for LHFS is intended to better reflect the underlying economics of the Company.  The Company's fair value election for both LHFS and loan commitments enables it to record all gains and losses in the statements of operations.

*Mortgage Production*:  Mortgage production includes the origination and sale of mortgages. Mortgage loans are originated through retail, wholesale brokerage, and correspondent lending channels.  Mortgage origination fees consist of fee income earned on all loan originations, and are reduced by the fees paid to wholesale brokers and correspondent brokers.  Under the Fair Value Option for the Company's LHFS, net fees associated with the origination and acquisition of LHFS are recognized as earned, rather than deferred, and the related direct loan origination costs are recognized when incurred.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1.      **Summary of Significant Accounting Policies, Continued:**

**Revenue Recognition, Continued:**

*Mortgage Production, Continued:*   Under the Fair Value Option, gain on sale of mortgage loan originations includes the realized and unrealized gains and losses on the Company's LHFS, as well as the changes in fair value of all loan commitments. The fair value of the Company's loan commitments is based upon the estimated fair value of the underlying mortgage loan, adjusted for: (i) estimated costs to complete and originate the loan and (ii) the estimated percentage of loan commitments that will result in a closed mortgage loan.   For loans expected to be sold on a servicing-released basis, the value of the mortgage servicing rights ("MSRs") is included in the fair value of loan commitments and LHFS.   For loans expected to be sold or securitized on a servicing-retained basis, the value of the MSRs is recorded when the loans are sold.

All of the Company's originated and acquired reverse mortgage loans were securitized through the GNMA HMBS program and the resulting securities were sold to approved broker dealers.   The Company continues to sell its originated forward mortgages directly to approved private investors and FNMA on a whole-loan basis in addition to securitizing and selling forward GNMA MBS to approved broker dealers. In accordance with FASB guidance for transfers of financial assets, the Company evaluates each type of securitization or sale for "sales" treatment, including sales under participation agreements.   This review includes both an accounting and a legal analysis to determine whether or not the transferred assets have been isolated from the transferor.   To the extent the transfer of assets qualifies as a sale, the Company derecognizes the asset and records the gain or loss on the sale date. In the event the Company determines that the transfer of assets does not qualify as a sale, the transfer would be treated as a secured borrowing.

The Company's policy for placing loans on non-accrual status is consistent with the Company's policy prior to the adoption of the Fair Value Option.   Loans are placed on non-accrual status when any portion of the principal or interest collectability is not probable. Interest received from loans on non-accrual status is recorded as income when collected.   Loans return to accrual status when the principal and interest become current and it is probable that the amounts are fully collectible.

*Interest Income*:   Interest income on loans is recognized on the unpaid principal balance, from the date of loan funding or acquisition to the date that loans are sold. Interest income on government bonds is recognized on the cash expected to be received based on the underlying assets of the bond for the period the bonds are held.

*Servicing Income*:   Servicing fee income includes direct servicing fees earned for servicing loans, premiums received related to the securitization of servicing balances into HMBS pools, and the servicing spread earned which represents the difference of the note rate of the underlying loans and the interest rate owed to the investors in the HMBS pools.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1.      **Summary of Significant Accounting Policies, Continued:**

**Use of Estimates:**  The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period reported.  Actual results could differ from those estimates.

**Cash and Cash Equivalents:** The Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

**Credit Risk:** Financial instruments which potentially subject the Company to concentrations of credit risk consist primarily of cash and receivables related to loan sales and servicing.  The Company maintains its cash and cash equivalents in bank accounts with balances that periodically exceed federally insured limits.

**Loans Held for Sale:**  Loans held for sale includes the originated or purchased mortgage loans reported at fair value.

**Mortgage Servicing Rights:**  Mortgage servicing rights consist of the following components:

*Future Net Servicing Income:* The future rights to servicing income related to mortgage loans is recognized as assets when the Company sells loans originated or purchased and retains the servicing rights.  Servicing rights in sold loans are recorded by allocating the previously recorded receivable between the assets sold and the interest retained based on their relative fair values at the date of transfer. The fair values of servicing rights are recognized at the date of transfer using the present value of estimated future cash flows.  Future net servicing income is amortized over the period of estimated net servicing income; and evaluated for impairment based upon the fair value of the asset as compared to the carrying amount.  Impairment is determined by stratifying rights into groupings based on defined origination tranches. Impairment is recognized through a valuation allowance to the extent that fair value is less than the capitalized amount.  Impairment charges are included in amortization of mortgage servicing rights on the accompanying statements of operations. If the Company later determines that all or a portion of the impairment no longer exists for a particular grouping, a reduction of the allowance may be recorded as an adjustment to amortization of mortgage servicing rights.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1. **Summary of Significant Accounting Policies, Continued:**

**Mortgage Servicing Rights, Continued:**

*Unsecuritized Servicing Balances:*  Unsecuritized servicing balances represent servicing balances which have not yet been included in a GNMA HMBS pool but were created pursuant to the terms of a reverse mortgage loan which has an initial balance securing an existing GNMA HMBS.  These servicing balances are created due to the Company's rights and obligations in its capacity as the issuer of the related GNMA HMBS and include borrower requested draws on their available lines of credit, advances to pay taxes and insurance related to the underlying property and monthly mortgage insurance premiums.  These balances are reported at cost which approximates fair value.

*Loan Servicing Receivable:*  Servicing related expense paid by the Company on behalf of FNMA that is recoverable from FNMA.  These balances are reported at cost which approximates fair value.

**Derivative Financial Instruments and Hedging Activities:** The Company uses derivatives to manage risks related to interest rate movements. The Company does not hold or issue derivative financial instruments for trading purposes. See Note 5.

**Reverse Repurchase Agreements:** Securities purchased or sold under agreements to resell or repurchase are reported at fair value in the accompanying statements of financial condition with changes in the fair value being reported in current operations. See Note 5.

**Real Estate Owned:**  Real estate owned represents properties relating to loans that are due and payable and subsequently removed from a pool. The Company obtains title to each property, initiates foreclosure, and attempts to sell the property to recoup the funds tied up in the loans. The properties acquired by the Company are primarily recorded at the unpaid principal balance of the loan given HUD insurance.  See Note 6.

**Income Taxes:**  The Company accounts for deferred income taxes by the liability method.  Deferred income taxes are computed based on the temporary differences between the financial statement carrying amounts and income tax basis of assets and liabilities using enacted tax rates in effect for the years in which the differences are expected to reverse.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1.     **Summary of Significant Accounting Policies, Continued:**

**Income Tax Uncertainties:**   The Company follows FASB guidance related to accounting for uncertainty in income taxes, which clarifies the accounting for income taxes by prescribing the minimum recognition threshold that a tax position is required to meet before being recognized in the Company's financial statements.  In accordance with the guidance, the Company discloses the expected future tax consequences of uncertain tax positions presuming the taxing authorities' full knowledge of the facts and the Company's position and records unrecognized tax benefits or liabilities for known, or anticipated tax issues based on the Company's analysis of whether additional taxes would be due to the authority given their full knowledge of the tax position.   The Company has completed its assessments and determined that there were no tax positions that would require recognition for 2016 and 2015. The Company is currently under audit by the Internal Revenue Service for 2015 and expects no findings or adjustments.

**Property and Equipment:**  Property and equipment are stated at cost.  Major repairs and betterments are capitalized and normal maintenance and repairs are charged to expense as incurred.  Depreciation is computed by the straight-line methods over the estimated useful lives of the related assets, which range from three to seven years. Upon retirement or sale of an asset, the cost and accumulated depreciation are removed from the accounts and any gain or loss is reflected in operations.

**Equity-Based Compensation:** The Company follows guidance from the FASB related to share-based payments, which requires that equity-based payment transactions be accounted for at their fair value and recognized as expenses in the statements of operations. Fair value of equity-based compensation is measured at the date of grant and the related unearned compensation amortized as compensation expense over the applicable vesting period.

**Recent Pronouncements:** In May 2014, the FASB issued Accounting Standards Update ("ASU") 2014-09 *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive new revenue recognition model requiring a company to recognize revenue to depict the transfer of goods or services to a customer at an amount reflecting the consideration it expects to receive in exchange for those goods or services. ASU 2014-09 may be applied using either a full retrospective or a modified retrospective approach and is effective for fiscal years, and interim periods within those years, beginning after December 15, 2018, and early adoption is not permitted.  The Company is currently evaluating the reporting and economic implications of the new standard.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1.      **Summary of Significant Accounting Policies, Continued:**

**Recent Pronouncements, Continued:**

In June 2014, the FASB issued ASU 2014-11 *Repurchase-to-Maturity Transactions, Repurchase Financings, and Disclosures*. ASU 2014-11 changed the accounting for repurchase-to-maturity transactions and linked repurchase financings to secured borrowing accounting, which is consistent with the accounting for other repurchase agreements. This accounting change was effective in the second quarter of fiscal 2015. The guidance also required new disclosures about certain transfers of financial assets accounted for as sales as well as increased transparency about the types of collateral pledged and remaining maturity of repurchase and securities lending agreements. The disclosure guidance related to certain transactions accounted for as sales was effective prospectively in the second quarter of fiscal 2015. The disclosure guidance related to the types of collateral pledged and remaining maturity of repurchase and securities lending agreements was effective prospectively in the third quarter of fiscal 2015. This guidance does not have a material impact on the financial statements.

In February 2016, the FASB issued ASU 2016-02 *Leases*.  ASU 2016-02 contains new guidance over leases which requires that all leasing activity with initial terms in excess of twelve months be recognized on the balance sheet with a right of use asset and a lease liability.  The standard will require entities to classify leases as either a finance or operating lease based upon the contractual terms.  For finance leases, the right of use asset and lease liability will be calculated based upon the present value of the lease payments.  The asset will then be amortized and the interest on the obligation will be recognized separately within the statement of operations.  For operating leases, the right of use assets and lease liability will also be calculated based upon the present value of the lease payments.  However, the cost of the lease will general be allocated over the lease term on a straight-line basis and presented as a single expense on the statement of operations.  The new standard will be effective for periods beginning after December 15, 2019, and will require entities to use a modified retrospective approach to the earliest period presented.  The Company is currently evaluating the reporting and economic stands of the new standard.

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments – Credit Losses.* ASU 2016-13 amends the guidance on reporting credit losses for assets held at amortized cost basis and available-for-sale debt securities. An entity is required to present assets held at an amortized cost basis net of an allowance for all expected credit losses, and any credit losses on available-for-sale debt securities are presented as an allowance rather than a write down. ASU 2016-13 is effective for fiscal years beginning after December 15, 2020, and early adoption is permitted for fiscal years, and interim periods within those years, beginning after December 15, 2018.  The Company is currently evaluating the reporting and economic implications of the new standard.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

1.  **Summary of Significant Accounting Policies, Continued:**

    **Reclassifications:**  Certain prior year balances have been reclassified to conform with the current year presentation.

    **Subsequent Events:**  Management has evaluated subsequent events through March 31, 2017, the date the financial statements were available to be issued, and has determined there are no subsequent events to be reported in the accompanying financial statements.

2.  **Property and Equipment:**

    Property and equipment consisted of the following at December 31:

    |                                | 2016 | 2015 |
    |--------------------------------|-----:|-----:|
    | Computer equipment             | $ 252,394 | $ 252,394 |
    | Furniture and fixtures         | 43,759 | 43,759 |
    | Office equipment               | 59,288 | 59,288 |
    |                                | 355,441 | 355,441 |
    | Less: accumulated depreciation | (328,796) | (280,595) |
    |                                | $ 26,645 | $ 74,846 |

3.  **Mortgage Servicing Rights:**

    Mortgage servicing rights consisted of the following at December 31:

    |                                         | 2016 | 2015 |
    |-----------------------------------------|-----:|-----:|
    | Mortgage servicing rights - GNMA        |      |      |
    | Future net servicing income             | $ 80,030,780 | $ 68,281,670 |
    | Unsecuritized servicing balances        | 18,170,685 | 14,588,623 |
    | Total mortgage servicing rights - GNMA  | 98,201,465 | 82,870,293 |
    | Mortgage servicing rights - FNMA        |      |      |
    | Future net servicing income             | 1,252,521 | 1,550,218 |
    | Loan servicing receivables              | 1,069,098 | 1,079,633 |
    | Total mortgage servicing rights - FNMA  | 2,321,619 | 2,629,851 |
    | Total mortgage servicing rights         | $ 100,523,084 | $ 85,500,144 |

15

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

3.      **Mortgage Servicing Rights, Continued:**

An analysis of future net servicing income for the years ended December 31, 2016 and 2015 is presented below:

|  | 2016 | 2015 |
|---|---|---|
| Balance, beginning of the year | $ 69,831,888 | $ 52,452,697 |
| Amounts capitalized | 34,892,747 | 33,743,459 |
| Amortization | (18,707,094) | (12,542,892) |
| Impairment charge | (4,734,240) | (3,821,376) |
| Balance, end of the year | $ 81,283,301 | $ 69,831,888 |

Fair value is estimated by discounting estimated future cash flows from the servicing assets using discount rates that approximate yields an investor would demand for a similar asset at a similar duration.  The fair value of future net servicing income assets for HECM whole loans sold with servicing retained as of December 31, 2016 and 2015 was determined using the average loan life for each loan in the portfolio based on HUD HECM data and discount rates of 4.00%.  The fair value of future net servicing income assets for loans collateralizing HMBS pools was based on an average discount rate of 3.69% as of December 31, 2016 and 3.32% as of December 31, 2015.  The Company recorded an impairment charge of $4,734,240 during 2016 and $3,821,376 during 2015 on its HMBS related future net servicing income assets.

At December 31, 2016, the estimated future amortization of future net servicing income is as follows:

| Year | Amortization |
|---|---|
| 2017 | $ 18,992,357 |
| 2018 | 17,758,783 |
| 2019 | 15,243,551 |
| 2020 | 14,363,720 |
| 2021 | 10,409,189 |
| Thereafter | 4,515,701 |
|  | $ 81,283,301 |

The projections of amortization expense for future net servicing income shown above is based on existing asset balances and the existing interest rate environment as of December 31, 2016.  Future amortization expense may be significantly different depending upon additions to the mortgage servicing portfolio.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

4.     **Fair Value Measurements:**

The Company follows FASB guidance on fair value measurements.  The provisions of the guidance provides a framework for measuring fair value under GAAP and defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date.  This guidance requires that valuation techniques maximize the use of observable inputs and minimize the use of unobservable inputs.  This guidance also establishes a fair value hierarchy which prioritizes the valuation inputs into three broad levels.

Based on the underlying inputs, each fair value measurement in its entirety is reported in one of three levels:

Level 1 – Unadjusted quoted prices that are available in active markets on major exchanges (e.g. New York Stock Exchange) for the identical assets or liabilities at the measurement date.

Level 2 – Quoted prices for similar instruments in active and inactive markets; and model driven valuations with significant inputs and drivers derived from observable active markets.

Level 3 – Unobservable inputs that cannot be corroborated by observable market data and reflect the use of significant management judgment.  These values are generally determined using pricing models for which the assumptions utilize management's estimates of market participant assumptions.

Assets measured at fair value on a recurring basis at December 31, 2016, include the following:

|  | Level 2 | Level 3 | Total Fair Value |
|---|---|---|---|
| Assets: |  |  |  |
| Loans held for sale | $    2,537,459 | $  74,471,751 | $  77,009,210 |
| Loan commitments | - | 576,508 | 576,508 |
| Reverse repurchase agreements | (11,006) | - | (11,006) |
| Government bonds available for sale | 520,368,332 | - | 520,368,332 |
| Total assets | $ 522,894,785 | $  75,048,259 | $ 597,943,044 |

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

4.    **Fair Value Measurements, Continued:**

Assets measured at fair value on a recurring basis at December 31, 2015, include the following:

| | Level 2 | Level 3 | Total Fair Value |
|---|---|---|---|
| Assets: | | | |
| Loans held for sale | $  2,317,546 | $ 84,741,839 | $ 87,059,385 |
| Loan commitments | - | (54,358) | (54,358) |
| Reverse repurchase agreements | 250,740 | - | 250,740 |
| Government bonds available for sale | 217,859,066 | - | 217,859,066 |
| Total assets | $ 220,427,352 | $ 84,687,481 | $ 305,114,833 |

The following table provides a reconciliation for 2016 between the beginning and ending balances of assets measured at fair value based on Level 3 valuation criteria:

| | Loans Held for Sale | Loan Commitments | Total |
|---|---|---|---|
| Balances at January 1, 2016 | $    84,741,839 | $     (54,358) | $   84,687,481 |
| Loan originations | 647,177,026 | - | 647,177,026 |
| Proceeds from loan sales | (638,131,569) | - | (638,131,569) |
| Realized loss included in gain on mortgage loans | (17,720,765) | - | (17,720,765) |
| Unrealized (losses) gains included in gain on mortgage loans | (1,594,780) | 630,866 | (963,914) |
| Balances at December 31, 2016 | $    74,471,751 | $    576,508 | $   75,048,259 |

18

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

4.    **Fair Value Measurements, Continued:**

The following table provides a reconciliation for 2015 between the beginning and ending balances of assets measured at fair value based on Level 3 valuation criteria:

|  | Loans Held for Sale | Loan Commitments | Total |
|---|---|---|---|
| Balances at January 1, 2015 | $    37,651,705 | $     268,718 | $    37,920,423 |
| Loan originations | 737,369,202 | - | 737,369,202 |
| Proceeds from loan sales | (678,875,465) | - | (678,875,465) |
| Realized loss included in gain on mortgage loans | (12,874,511) | - | (12,874,511) |
| Unrealized gains (losses) included in gain on mortgage loans | 1,470,908 | (323,076) | 1,147,832 |
| Balances at December 31, 2015 | $    84,741,839 | $    (54,358) | $    84,687,481 |

The following methods and assumptions were used to estimate the fair value of each class of financial instruments.

**Loans Held for Sale:** The fair value of forward mortgage loans is based on the price secondary markets are currently offering for similar loans using observable market data (Level 2).   Reverse mortgage loans are generally classified within Level 3 of the valuation hierarchy due to the lack of observable pricing data for the sale of the loan and the servicing component of the loan. The Company uses the market approach valuation technique to measure the fair value of Level 3 financial instruments.   Significant unobservable inputs consist primarily of HMBS pricing which can differ across product types and note rates.  The Company receives HMBS price indicators as of the balance sheet date from various active broker dealers in the HMBS market.   Those price indicators can range based on product type between 25-75 basis points.  The Company uses the average price indicator by product type in its fair value measurement.

**Loan Commitments:**  Loan commitments are generally classified within Level 3 of the valuation hierarchy due to the lack of observable pricing data for the underlying valuation of the loan and the estimated percentage of loan commitments that will result in a closed mortgage loan.  The underlying loans are valued using a methodology consistent with the valuation of LHFS.  The Company uses the market approach valuation technique to measure the fair value of Level 3 financial instruments.  Significant unobservable inputs consist primarily of HMBS pricing which can differ across product types and note rates. The Company receives HMBS price indicators as of the balance sheet date from various active broker dealers in the HMBS market.  Those price indicators can range based on product type between 25-75 basis points.  The Company uses the average price indicator by product type in its fair value measurement.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

4.    **Fair Value Measurements, Continued:**

**Repurchase Agreements:** These investments are classified within Level 2 of the valuation hierarchy based on the price secondary markets are currently offering for similar investments using observable market data and model driven valuations.

**Government Bonds Available for Sale:** Government bonds available for sale consists of residential mortgage-backed securities for which the principal and interest payments are guaranteed by a U.S. Government Agency, which also includes agency collateralized mortgage obligations and interest only securities. These investments are classified within Level 2 of the valuation hierarchy based on the price secondary markets are currently offering for similar investments using observable market data and model driven valuations. The Company carries these securities at fair value derived from an independent third-party pricing source that provides daily price quotes; which are specific to each bond CUSIP. This pricing service is also utilized by other industry participants to determine collateral values and active trades on bonds.

5.    **Derivative Financial Instruments:**

**Reverse Repurchase Agreements:** The Company may enter into reverse repurchase agreements in order to hedge against certain interest rate risks associated with its GNMA Bond portfolio, under the terms of a Master Repurchase Agreement, with selected commercial banks and broker-dealers ("Repo Counterparties"), under which the Company agrees to transfer to Repo Counterparties, funds, against the transfer of securities or other assets by Repo Counterparties, with a simultaneous agreement by Repo Counterparties to transfer to the Company, funds, at a date certain or on demand, against the transfer of such securities by Company. It is the Company's policy to maintain compliance with each repurchase agreement that it enters into. This will include, but is not limited to, maintaining required haircut amounts and meeting margin calls as the market value of the collateral fluctuates.

Information about financial assets and liabilities that are eligible for offset on the balance sheet as of December 31, 2016, is presented in the following table.

| Description | Gross Amount of Assets Recognized | Gross Amount Offset in the Balance Sheet | Net Amount of Liabilities Presented in the Balance Sheet |
|---|---|---|---|
| Reverse Repurchase Agreements | $           28,660,625 | $           28,671,631 | $            (11,006) |

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

5.   **Derivative Financial Instruments, Continued:**

Information about financial assets and liabilities that are eligible for offset on the balance sheet as of December 31, 2015 is presented in the following table.

| Description | Gross Amount of Assets Recognized | Gross Amount Offset in the Balance Sheet | Net Amount of Assets Presented in the Balance Sheet |
|---|---|---|---|
| Reverse Repurchase Agreements | $ 272,661,482 | $ 272,410,742 | $ 250,740 |

**Rate Lock Commitments:**   The Company enters into interest rate lock commitments ("IRLCs") with prospective residential forward mortgage borrowers whereby the interest rate on the loan is determined prior to funding and the borrowers have locked into that interest rate.  The estimated fair values of IRLCs are based on quoted market values and are recorded in other assets in the statements of financial condition.  The initial and subsequent changes in the value of IRLCs are a component of gain on mortgage loans. The Company actively manages the risk profiles of its IRLCs and mortgage loans held for sale on a daily basis.  To manage the price risk associated with IRLCs, the Company enters into forward sales of mortgage-backed securities in an amount equal to the portion of the IRLC expected to close, considering current mortgage interest rates.  In addition, to manage the interest rate risk associated with mortgage loans held for sale, the Company enters into forward sales of mortgage-backed securities to deliver mortgage loan inventory to investors. The estimated fair values of forward sales of mortgage-backed securities and forward sale commitments are based on quoted market values and are recorded in other assets or an accrued liability in the statements of financial condition. The initial and subsequent changes in value on forward sales of mortgage-backed securities are a component of gain on mortgage loans.

At December 31, 2016 and 2015, the notional balances and fair values of outstanding positions associated with open derivative instruments were as follows:

| | Year | Expiration Dates | Notional Balance | Gains / (Losses) |
|---|---|---|---|---|
| IRLCs | 2016 | 2017 | $ 1,500,000 | $ 1,563 |
| IRLCs | 2015 | 2016 | $ 4,500,000 | $ (9,531) |

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

6.    **Other Assets:**

Other assets included the following as of December 31:

|  | 2016 | 2015 |
|---|---|---|
| Other receivables | $       318,620 | $       174,344 |
| Deposits | 59,054 | 45,604 |
| Other real estate owned | 3,607,554 | 815,311 |
|  | $    3,985,228 | $    1,035,259 |

7.    **Financing Arrangements:**

During 2016, the Company entered into note agreements with individuals totaling $200,000.  The note agreements bear interest at rates ranging from 6.0% to 8.0%. Of these notes, $50,000 matures April 2017, $100,000 matures November 2017, and $50,000 matures April 2019.  See note 15 for amounts due to related parties.

***Lines of Credit:***  The Company has a committed $60,000,000 warehouse line of credit with a commercial bank used to finance its mortgage lending activities until loans are sold to qualified investors, borrow against government bonds, finance unsecuritized servicing balances, and purchase loans from GNMA HMBS pools. Borrowings under this agreement bear interest at monthly LIBOR plus 3.25% and may increase to specified rates up to LIBOR plus 5.75% based on the number of days the financed mortgage loan stays on the line.  The availability of the facility expires in May 2017. Borrowings are collateralized by the mortgage loans, government bonds, and GNMA related Mortgage Servicing Rights, a restricted cash deposit of $600,000 and a personal guarantee by the Company's Chairman and CEO. The agreement contains various financial requirements and the maintenance of financial ratios; the Company was in compliance with these requirements at the end of 2016 and 2015.  As of December 31, 2016, outstanding borrowings on the line of credit were $25,227,612, with remaining availability of $34,772,388. As of December 31, 2015, outstanding borrowings under this agreement were $24,202,066, with remaining availability of $35,797,934.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

**7.      Financing Arrangements, Continued:**

Effective December 2014, the Company entered into an agreement for a $25,000,000 committed warehouse line of credit with a commercial bank used to finance its mortgage lending activities until loans are sold to qualified investors and effective February 2015, the Company can use up to $12,500,000 of the line of credit on a revolving basis to purchase loans from GNMA HMBS pools.  Borrowings were increased to $50,000,000 effective May 2015 and effective October 2015, the Company can use up to $25,000,000 of the line of credit on a revolving basis to purchase loans from GNMA HMBS pools. Borrowings under this agreement bear interest at One Month LIBOR plus 3.25%.  The borrowings are collateralized by the mortgage loans financed, and guaranteed by the Company's Chairman and CEO.  The availability of the facility expires in April 2017.  The Company pays a 0.1% fee on any unused portion of the facility, when outstanding balance is less than 50% of total warehouse line. The agreement contains various other financial requirements and the maintenance of financial ratios; the Company was in compliance with these requirements at the end of 2016 and 2015.  As of December 31, 2016, outstanding borrowings under this agreement were $41,030,224, with remaining availability of $8,969,776. As of December 31, 2015, outstanding borrowings under this agreement were $49,292,351, with remaining availability of $707,649.

Effective August 2015, the Company entered into an agreement for a $25,000,000 committed warehouse line of credit with a commercial bank used to finance its mortgage lending activities until loans are sold to qualified investors and purchase loans from GNMA HMBS pools. Borrowings were increased to $65,000,000 effective December 11, 2015. Borrowings under this agreement bear interest at One Month LIBOR plus 3.30%, with a floor of 3.45%. The borrowings are collateralized by the mortgage loans financed and guaranteed by the Company's Chairman and CEO. The availability of the facility expires in July 2017.  The agreement contains various financial requirements and the maintenance of financial ratios; the Company was in compliance with these requirements at the end of 2016 and 2015.  As of December 31, 2016, outstanding borrowings under this agreement were $41,808,751, with remaining availability of $23,191,249. As of December 31, 2015, outstanding borrowings under this agreement were $31,522,432, with remaining availability of $33,477,568.

Effective November 2016, the Company entered into an agreement for a $5,000,000 committed warehouse line of credit with a commercial bank used to finance its mortgage lending activities until loans are sold to qualified investors.  Borrowings under this agreement bear interest at One Month LIBOR plus 2.5%.  The borrowings are collateralized by the mortgage loans financed and guaranteed by the Company's Chairman and CEO.  The availability of the facility expires in November 2017.  The agreement contains various financial requirements and the maintenance of financial ratios; the Company was in compliance with these requirements at the end of 2016.  As of December 31, 2016, outstanding borrowings under this agreement were $585,747, with remaining availability of $4,414,253.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

7.    **Financing Arrangements, Continued:**

Effective April 2016, the Company entered into an agreement for a $5,000,000 line of credit.  Borrowings under the line bear interest at One Month LIBOR plus 3.75%.  The borrowings are cross-collateralized by the mortgage loans financed under a warehouse line provided by the same institution and guaranteed by the Company's Chairman and CEO.  The availability of the facility expires in May 2017.  The agreement contains various financial requirement and the maintenance of financial ratios; the Company was in compliance with these requirements at the end of 2016.  As of December 31, 2016, there were no outstanding borrowings under this agreement.

The Company has a revolving line of credit with a commercial bank providing for maximum borrowings of $50,000.  Interest on funds is payable monthly at a prime rate of 7.75%.  As of December 31, 2016 and 2015, there were no outstanding borrowings under this agreement.  Borrowings are collateralized by a personal guarantee by the Company's chairman and CEO.

Through November 2015, the Company had an agreement with a commercial bank for a $2,000,000 unsecured line of credit that matured and not renewed by the Company during 2015. Borrowings under this agreement bore interest at an initial annual rate of LIBOR plus 3.75%.  Borrowings were collateralized, until repayment in 2015, by a personal guarantee by the Company's Chairman and CEO.  The agreement contained various financial requirements and the maintenance of financial ratios; the Company was in compliance with these requirements at the time the facility matured.

***Master Repurchase Agreements***:  The Company has entered into master repurchase agreements with multiple major financial institutions. The purpose of these repurchase agreements is to finance the acquisition and ownership of government bonds available for sale.  The Company has effective control of the assets associated with these agreements and therefore has concluded these are financing arrangements. As such, the Company record investments financed with repurchase agreements as separate assets and the related borrowings under any repurchase agreements are recorded as separate liabilities on the statements of financial condition.  Interest income earned on the investments and interest expense incurred on the repurchase agreements are reported separately on the statements of operations.

Effective August 2014, the Company entered into a master purchase agreement with a financial institution backed by a portfolio of GNMA bond investments. Interest received or distributed with respect to the underlying investments will be used to repay the outstanding debt. At December 31, 2016, the interest rates on borrowings under this agreement was 1.5%. The amount outstanding was $84,082,000 at December 31, 2016. At December 31, 2015, the interest rate on borrowings under this agreement was 0.85%. The amount outstanding was $39,678,000 at December 31, 2015.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

**7.      Financing Arrangements, Continued:**

Effective June 2015, the Company entered into a master repurchase agreement with a financial institution backed by a portfolio of GNMA interest-only bond investments. Interest received or distributed with respect to the underlying investments will be used to repay the outstanding debt. At December 31, 2016, the interest rates on borrowings under this agreement was 2.25%. The amount outstanding was $225,000,000 at December 31, 2016.  At December 31, 2015, the interest rate on borrowings under this agreement was 1.25%.  The amount outstanding was $140,970,000 at December 31, 2015.

Effective September 2014, the Company entered into a master repurchase agreement with a financial institution backed by a portfolio of GNMA interest-only bond investments. Interest received or distributed with respect to the underlying investments will be used to repay the outstanding debt. At December 31, 2016, the interest rate on borrowings under this agreement was Six Month LIBOR plus 2.5%. The amount outstanding was $6,508,000 at December 31, 2016. At December 31, 2015, the interest rate on borrowings under this agreement was 1.36%.  The amount outstanding was $1,084,000 at December 31, 2015.

Effective April 2016, the Company entered into a master repurchase agreement with a financial institution backed by a portfolio of GNMA interest-only bond investments. Interest received or distributed with respect to the underlying investments will be used to repay the outstanding debt.  At December 31, 2016, the interest rates on borrowings under this agreement was 2.5%.   The amount outstanding was $100,113,086 at December 31, 2016.

Effective August 2014, the Company entered into a $15,000,000 master repurchase agreement with a financial institution backed by a portfolio of GNMA interest-only bond investments.  Interest received or distributed with respect to the underlying investments will be used to repay the outstanding debt.  There were no outstanding borrowings at December 31, 2016 or 2015.

Effective December 2014, the Company entered into a master repurchase agreement with a financial institution backed by a portfolio of GNMA interest-only bond investments. Interest received or distributed with respect to the underlying investments will be used to repay the outstanding debt.  During 2015, the Company paid off the facility and terminated the agreement.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

8.    **Subordinated Notes Payable:**

On September 30, 2016, the Company entered into an agreement to repurchase all outstanding preferred stock from existing stockholders.  As part of this agreement, the Company issued unsecured, subordinated promissory notes in the aggregate amount of $11,000,000.  These notes are subordinated to the Company's existing and future senior debt and up to an additional $130,000,000 of unsecured debt.  These promissory notes accrue interest at 6%.  Interest only payments are due at the end of each calendar quarter with the outstanding notes balances becoming due on September 30, 2021.  The promissory notes also contain an "End of Term Fee" that provides for an additional fee of 20% to 40% of the outstanding principal should the notes be paid after September 30, 2019, as defined in the agreement.  In addition, the promissory notes require certain liquidity payments should the Company's liquidity exceed established amounts in the Purchase Agreement.  These payments will be applied first to outstanding accrued interest, then to outstanding End of Term Fees, and finally to outstanding principal.  As of December 31, 2016, the Company is also in compliance with various other covenants contained within the agreement.

9.    **Accounts Payable and Accrued Expenses:**

Accounts payable and accrued expenses include the following as of December 31:

|  | 2016 | 2015 |
|---|---|---|
| Mortgage escrows payable | $ 61,691,904 | $ 25,855,531 |
| Accrued compensation | 2,594,567 | 7,400,103 |
| Accounts payable | 4,412,087 | 979,887 |
| Accrued interest | 751,425 | 1,070,440 |
| Guarantee and director fees payable | 7,749,758 | - |
|  | $ 77,199,741 | $ 35,305,961 |

10.    **Stockholders' Agreements:**

**Common Stock**

The Company is authorized to issue 3,923 shares of common stock, $1.00 par value.  There were 1,853 common shares outstanding at December 31, 2016 and 2015.

The Company and its common stockholders have entered into an agreement which provides each stockholder with a right of first refusal to purchase all of the Company's common stock proposed to be sold by any stockholder.  In addition, certain stockholders have the right, upon receiving notice of another stockholder's intent to sell certain stock, to sell their shares upon the same terms negotiated by the selling stockholder.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

**10.     Stockholders' Agreements, Continued:**

Stockholders controlling more than 50% of the Company's common stock can compel other stockholders to join in any proposed merger or sale of the Company's assets.  The stockholders have a preemptive right to purchase all or any portion of an offering by the Company of common stock such that the stockholders' percentage ownership before and after the offering shall remain unchanged.

In addition, the Company's common stockholders have the right, upon receiving notice of an original stockholder's (as defined) intent to sell shares, to sell their shares at the same price per share and on the same terms as the original stockholder.  Holders of more than 51% of all institutional shares, as defined, can compel other stockholders to join in a proposed sale of the Company.

All stockholders have certain preemptive rights with respect to any proposed issuance by the Company of any of its securities (other than debt securities with no equity feature), to purchase a number of securities such that the stockholders maintain their same proportionate equity ownership in the Company.

**11.     Stock Option Plan:**

In September 2008, the Company adopted a stock option plan under which up to 282 shares of the Company's common stock are reserved for issuance upon exercise of options that may be granted to key employees, officers, directors and consultants. Generally, under the plan, options will become 25% exercisable one-year after the date of grant, with the remaining unvested portion vesting monthly over the next three years, and will expire if not exercised at the period of ten years from the date of grant.  The exercise price of options expected to be granted under the plan will generally be at the fair value of the Company's common stock at the date of grant, as determined by the Company's board of directors.  Shares of stock issued upon exercise of options will be subject to a first right of repurchase by the Company.

During 2013, the Company issued 156.76 common stock options to certain officers at an initial fair value of $15,163 per option.  Each option represents the right to purchase one share of common stock at an exercise price of $15,163 per share.  During 2016 and 2015, 39.19 of these options vested and became fully exercisable.  The Company recognized $209,532 of compensation expense related to the vesting.  The fair value of each option was estimated at the grant date using the fair value method.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

**11.    Stock Option Plan, Continued:**

The assumptions used in calculating the estimated fair value of stock option granted during 2016 and 2015 are as follows:

| | |
|---|---|
| Dividend yield | 0% |
| Volatility percentage | 40% |
| Weighted-average risk free interest rate | 3.00% |
| Holding period (years) | 4 |

**12.    Income Taxes:**

The provisions for income tax expense for the years ended December 31, 2016 and 2015 consist of the following:

| | 2016 | 2015 |
|---|---|---|
| Current: | | |
| Federal | $        (505,742) | $    (3,839,178) |
| State | (574,410) | (420,899) |
| | (1,080,152) | (4,260,077) |
| Deferred: | | |
| Federal | 27,178,953 | 19,035,160 |
| State | 3,197,524 | 2,239,430 |
| | 30,376,477 | 21,274,590 |
| Total income tax expense | $    29,296,325 | $    17,014,513 |

The tax effects of temporary differences that give rise to significant portions of the deferred tax liabilities at December 31 are as follows:

| | 2016 | 2015 |
|---|---|---|
| Mortgage servicing rights | $   (30,887,654) | $   (26,583,459) |
| Allowance for loan losses | 12,796,591 | 4,561,210 |
| Accrued expenses | 2,920,561 | 1,948,866 |
| Fair value adjustments | (49,825,230) | (18,932,303) |
| Bond original issue discount interest | (6,929,905) | - |
| Capital loss carryforward | 953,472 | 953,472 |
| Federal and state net operating loss carryforward | 2,456,656 | - |
| Other, net | 197,431 | 286,927 |
| Net deferred tax liability | $   (68,318,078) | $   (37,765,287) |

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

13.    **Commitments:**

**Lease Commitments:**  The Company has entered into various lease agreements for office space that include scheduled rent increases at specified intervals during the term of the leases and expire at various times through 2021.  Rent expense amounted to $845,990 for 2016 and $692,800 for 2015.

At December 31, 2016, the approximate minimum commitments for lease agreements are as follows:

| Year | Amount |
|------|--------|
| 2017 | $    638,302 |
| 2018 | 361,455 |
| 2019 | 371,173 |
| 2020 | 206,121 |
| 2021 | 34,494 |
|      | $  1,611,545 |

**Loan Funding Commitments:**  At December 31, 2016 and 2015, the Company had commitments to fund mortgage loans of $25 million and $31.0 million, respectively, with agreed-upon rates or rate protection.

**Government Bond Commitments:**  At December 31, 2015, the Company had two government bonds that traded in December but were not settled until January 2016. The bonds had a purchase price of $5,466,592 and $12,746,832, respectively, and a fair market value of $7,016,154 and $16,995,775, respectively, as of December 31, 2015.

14.    **Contingencies and Guarantees:**

The Company's agreements with various government agencies include representations and warranties related to the loans the Company sells under the agency's approval. The representations and warranties require adherence to agency origination and underwriting guidelines, including but not limited to the validity of the lien securing the loan, property eligibility, borrower credit, income and asset requirements, and compliance with applicable federal, state and local law.

In the event of a breach of its representations and warranties, the Company may be required to either repurchase the mortgage loans with the identified defects or indemnify the government agency.  In such cases, the Company bears any subsequent credit loss on the mortgage loans.  The Company's representations and warranties are generally not subject to stated limits of exposure.  The Company's credit loss may be reduced by any recourse it has to correspondent lenders that, in turn, had sold such mortgage loans to the Company and breached similar or other representations and warranties.  In such event, the Company has the right to seek a recovery of related repurchase losses from that correspondent lender.

29

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

14.  **Contingencies and Guarantees, Continued:**

The Company records a provision for losses relating to the representations and warranties it makes as part of its loan sale and securitization transactions.  The method used to estimate the liability for representations and warranties is a function of the representations and warranties given and considers a combination of factors, including, but not limited to, estimated future defaults and loan repurchase rates and the potential severity of loss in the event of defaults and the probability of reimbursement by the correspondent loan seller.  The Company continually updates its liability estimates.  At December 31 2016 and 2015, the Company's general reserve for loan losses and reserve for any losses that may be realized on loans associated with HMBS pools in future years was as follows:

|  | 2016 | 2015 |
|---|---|---|
| HMBS pool loss reserve | $ 31,997,888 | $ 10,553,481 |
| Other loss reserve | 948,573 | 1,132,656 |
| Total loss reserve | $ 32,946,461 | $ 11,686,137 |

Pursuant to its Articles of Incorporation, the Company has certain obligations to indemnify its current and former officers and directors for certain events or occurrences while the officer or director is, or was serving, at the Company's request in such capacities.  The maximum liability under these obligations is unlimited; however, the Company's insurance policies serve to limit its exposure.  The Company believes that the estimated fair value of these indemnification obligations is minimal.

15.  **Related Party Transactions:**

Since the Company's inception, an officer of the Company has guaranteed payment of certain debt described in Note 7 and certain credit card debt of the Company and has provided guarantees to sureties in respect of performance and payment bonds issued by the sureties in connection with certain contracts entered into by the Company in the normal course of business.  Accordingly the Board of Directors engaged an independent consultant who had expertise related to compensation related to guarantee fees.  Based on the report of the independent consultant, it was determined that the officer is to be compensated at an annual rate of 1.5% of the guaranteed amount, including amounts guaranteed by the officer prior to 2016.  Compensation for prior periods was equal to $5,845,358, which the officer agreed to be paid in 24 equal installments beginning in May 2017.  Guarantee expense in 2016, included as a component of interest expense, was $1,495,480.

**LIVE WELL FINANCIAL, INC.**

Notes to Financial Statements, Continued

**15.    Related Party Transactions, Continued:**

During 2016, the Company elected to retroactively compensate its current directors for serving in this role.  Given the extensive time commitment that each member of the Board of Directors must spend related to their fiduciary responsibilities, it was determined the Company would compensate existing directors for their roles and responsibilities.  Accordingly, the Board of Directors engaged an independent consultant who had expertise related to director fee compensation.  Based on the report of the independent consultant, it was determined the existing directors in total would be compensated in the amount of $2,004,400, which is included as operating expense.

During 2016, the Company entered into note agreements with a shareholder totaling $100,000.  The note agreements bear interest at rates ranging from 6.0% to 8.0%. Of these notes, $50,000 matures April 2017 and $50,000 matures April 2019.

**16.    Employee Retirement Plan:**

The Company sponsors a defined contribution retirement plan which covers all employees who meet eligibility requirements. The plan enables participants to make contributions, and the Company may make matching or discretionary contributions. The Company's contributions to the plan amounted to $132,691 during 2016 and $19,620 during 2015.

**17.    Regulatory Capital Requirements:**

The Company is required to maintain specific levels of stockholders' equity to maintain its status as a seller/servicer in good standing with various government agencies.  Such equity requirements generally are based on the size of the Company's loan servicing portfolio or loan origination volume.  Failure to maintain minimum capital requirements could result in the Company's inability to originate and sell or securitize loans and service loans for the respective agencies and, therefore, could have a direct material effect on the Company's financial statements.  The Company's actual capital amounts and the minimum amounts required for capital adequacy purposes by each agency are as follows:

|  | 2016 | | 2015 | |
|---|---|---|---|---|
|  | Net Worth | Minimum Capital Requirements | Net Worth | Minimum Capital Requirements |
| HUD | $  93,050,588 | $   2,500,000 | $  73,498,714 | $   2,500,000 |
| GNMA-HMBS | $  93,050,588 | $  39,790,453 | $  73,498,714 | $  35,626,349 |
| GNMA-MBS | $  93,050,588 | $  39,790,453 | $  73,498,714 | $  35,626,349 |

**Supplemental Information**

**LIVE WELL FINANCIAL, INC.**

Schedule of Adjusted Net Worth Computation – FHA Title II Lenders
FHA Lender No. 2319800009
Year Ended December 31, 2016

| | |
|---|---:|
| FHA servicing portfolio at year end | $ 3,642,299,229 |
| FHA originations - FHA-insured Title II loan origination during the fiscal year | 325,777,743 |
| FHA purchases - FHA-insured Title II third-party originator purchases during the fiscal year | 352,701,876 |
| Total FHA loan activity | 4,320,778,848 |
| FHA-insured Title II loan origination retained at the fiscal year end | 50,469,278 |
| FHA-insured Title II third-party originator purchases retained at the end of the fiscal year | 17,016,808 |
| Adjustments | 67,486,086 |
| Total adjusted FHA loan activity | 4,253,292,762 |
| **Net worth required** | $ 1,000,000 |
| Additional net worth required | 42,282,928 |
| **Total net worth** | 2,500,000 |
| Stockholder' equity (net worth) per balance sheet | 93,050,588 |
| Less unacceptable assets | - |
| Adjusted net worth | 93,050,588 |
| Minimum net worth | 2,500,000 |
| Adjusted net worth above/(below) required minimum amount | $ 90,550,588 |

See Report of Independent Accountants.

# LIVE WELL FINANCIAL, INC.

HUD Financial Data Templates
FHA Lender No. 2319800009
As of and For the Year December 31, 2016

**Balance Sheet - Assets**

| Line Item # | Title | Value |
|---|---|---|
| 100 | Cash and Cash Equivalents | $ 23,025,947 |
| 101 | Escrow deposit Cash | $ 57,647,231 |
| 102 | Restricted Cash / Compensating Balances | $ 1,300,000 |
| 103 | Trading Account Securities | $ - |
| 104 | Net Mortgage Servicing Rights | $ 100,523,084 |
| 105 | Other Real Estate Owned at Net Realizable Value | $ 3,607,554 |
| 106 | Loans Held for Investment | $ 2,171,745 |

**Balance Sheet - Unacceptable Assets**

| Line Item # | Title | Value |
|---|---|---|
| 200 | Pledged Assets | $ - |
| 201 | Assets Due from an Officer, Stockholder, or Related Entity | $ - |
| 202 | Personal Interest Investment | $ - |
| 203 | Investment in Related Entity, Greater than Equity As Adjusted | $ - |
| 204 | Intangible Assets, Net of Amortization | $ - |
| 205 | Value of Servicing Contract not in Accordance with ASC 948 and ASC 860 | $ - |
| 206 | Assets not Readily Marketable | $ - |
| 207 | Marketable Security in Excess of Cost or Market | $ - |
| 208 | Amount in Excess of Foreclosure Value | $ - |
| 209 | Assets used for Personal Enjoyment | $ - |
| 210 | Other Unacceptable Assets | $ - |
| 211 | Contributed Property in Excess of Appraised Value | $ - |
| 212 | Total Unacceptable Assets | $ - |

**Balance Sheet - Liability**

| Line Item # | Title | Value |
|---|---|---|
| 300 | Escrows Payable | $ 61,691,904 |

See Report of Independent Accountants.

# LIVE WELL FINANCIAL, INC.

HUD Financial Data Templates, Continued
FHA Lender No. 2319800009
As of and For the Year December 31, 2016

**Statement of Operations and Equity - Revenue**

| Line Item # | Title | Value |
|---|---|---|
| 400 | Gross Interest Income | $                43,031,727 |
| 401 | Net Marketing Gain (Loss) on Loans and MBS sold with servicing retained | $                38,054,577 |
| 402 | Net Marketing Gain (Loss) on Loans and MBS sold with servicing released including the Servicing Release Premium | $                           - |
| 403 | Net Gain (Loss) on Sales of Servicing Rights | $                           - |
| 404 | Net Gain (Loss) from Servicing Valuations | $                           - |
| 405 | Net Gain (Loss) on Sale of Securities | $                           - |
| 406 | Net Gain (Loss) on Sale of OREO | $                           - |
| 407 | Retail Origination Fees | $                           - |
| 408 | Net Loan Administration Income | $                25,727,157 |
| 409 | Correspondent and Broker Fee Income | $                           - |
| 410 | Other Retail Origination Income | $                           - |
| 411 | Other Income (Loss) Related To Mortgage Lending Activities | $                  3,461,634 |
| 412 | Other Income (Loss) Not Related To Mortgage Lending Activities | $                76,277,766 |
| 413 | Total Revenue | $              186,552,861 |

**Statement of Equity**

| Line Item # | Title | Value |
|---|---|---|
| 500 | Balance at Beginning of the Year, as Reported | $                73,498,714 |
| 501 | Prior Period Adjustments | $                           - |
| 502 | Balance at Beginning of the Year, Restated | $                73,498,714 |
| 503 | Net Income | $                48,342,342 |
| 504 | Dividend / Distribution | $                           - |
| 505 | Contributions - from Cash Flow Statement | $                           - |
| 506 | Contributions - non-cash | $                           - |
| 507 | Other Equity | $              (28,790,468) |
| 508 | Ending Balance | $                93,050,588 |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

HUD Financial Data Templates, Continued
FHA Lender No. 2319800009
As of and For the Year December 31, 2016

**Net Worth**

| Line Item # | Title | Value |
|---|---|---|
| 600 | FHA Servicing Portfolio | $ 3,642,299,229 |
| 601 | FHA Originations | $ 325,777,743 |
| 602 | FHA Purchases | $ 352,701,876 |
| 603 | Subtotal - FHA Loan Activity | $ 4,320,778,848 |
| 604 | FHA Origination Servicing Retained | $ 50,469,278 |
| 605 | FHA Purchase Servicing Retained | $ 17,016,808 |
| 606 | Subtotal - Servicing Retained Adjustments | $ 67,486,086 |
| 607 | Total Adjusted FHA Loan Activity | $ 4,253,292,762 |
| 608 | Net Worth Required Baseline | $ 1,000,000 |
| 609 | Additional Net Worth Required | $ 42,282,928 |
| 610 | Total Minimum Net Worth Required | $ 2,500,000 |
| 611 | Stockholder Equity - Ending Balance | $ 93,050,588 |
| 612 | Total Unacceptable Assets | $ - |
| 613 | Adjusted Net Worth | $ 93,050,588 |
| 614 | Adjusted Net Worth Above/Below Required Minimum Amount | $ 90,550,588 |

**Liquidity**

| Line Item # | Title | Value |
|---|---|---|
| 700 | Cash and Cash Equivalents | $ 23,025,947 |
| 701 | Trading Account Securities | $ - |
| 702 | Total of Liquid Assets per HUD Guidelines | $ 23,025,947 |
| 703 | Liquid Assets Required | $ 500,000 |
| 704 | Liquid Assets Above/Below Required Amount | $ 22,525,947 |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Adjusted Net Worth Calculation
GNMA Issuer No. 4174
Year Ended December 31, 2016

**A. <u>Adjusted net worth calculation:</u>**

Stockholders' equity per statement of financial
condition at end of reporting period $ 93,050,588

Less:

Itemized unacceptable assets:
Total unacceptable assets -

Adjusted net worth $ 93,050,588

**B. <u>Required net worth calculation:</u>**

Unpaid principal balance of
securities outstanding
(Note: number of pools = 290) $ 3,177,093,690

Plus:

Outstanding balance of commitment
authority issued and requested 42,518,274

Total outstanding portfolio and authority 3,219,611,964

Required net worth $ 39,790,453

**C. <u>Excess (deficit) net worth:</u>**

(Adjusted net worth - required net worth) $ 53,260,135

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Capital Requirement Calculation
GNMA Issuer No. 4174
Year Ended December 31, 2016

**A.** **Capital requirement for depository institutions:**                    **(Not Applicable)**

| | | |
|---|---|---|
| Tier 1 Capital | $ - | |
| Total capital | $ - | |
| | | |
| Risk-based assets | $ - | |
| Total assets | $ - | |
| | | |
| Tier 1 capital/total assets | | 0% |
| Tier 1 capital/risk-based assets | | 0% |
| Total capital/risk based assets | | 0% |

**Meets requirement?**
*(yes/no)*

| | | |
|---|---|---|
| 5% of tier 1 capital/total assets | $ - | |
| 6% of tier 1 capital/risk-based assets | $ - | |
| 10% of total capital/risk based assets | $ - | |

**B.** **Capital requirement for nondepository institutions:**

| | |
|---|---|
| Total adjusted net worth | $    93,050,588 |
| Total assets | $   807,070,288 |

**Meets requirement?**
*(yes/no)*

| | | |
|---|---|---|
| Total adjusted net worth/total assets | 11.53% | Yes |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Liquid Asset Requirement Calculation
GNMA Issuer No. 4174
Year Ended December 31, 2016

**A.    Liquid asset calculation:**

Required net worth                                                  $   39,790,453

Acceptable liquid assets
1. Cash and cash equivalents            $   80,673,178

Total liquid assets                                                $   80,673,178

**B.    Required liquid assets:**

|  | Meets requirement? |
|---|---|
|  | *(yes/no)* |
| **Excess (deficit) liquid**<br>(Total liquid assets / required net worth) | 202.75%    Yes |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Insurance Requirement
GNMA Issuer No. 4174
Year Ended December 31, 2016

**A. Identification of affiliated Ginnie Mae issuers:**

Affiliated Ginnie Mae issuers:   Live Well Financial, Inc.  - Issuer ID No. 4174
(Issuer name and Ginnie Mae issuer identification number)

Affiliated issuers
on same insurance policies:   None
(Issuer name and Ginnie Mae issuer identification number)

**B. Required insurance calculation:**

| | | |
|---|---|---:|
| Servicing portfolio: | | |
| Ginnie Mae | $ | 3,195,264,340 |
| Fannie Mae | $ | 210,358,651 |
| Freddie Mac | $ | - |
| Conventional (other) | $ | 127,724,887 |
| Total servicing portfolio | $ | 3,533,347,878 |
| Required fidelity bond coverage | $ | 4,058,348 |
| Required mortgage servicing errors and omissions coverage | $ | 4,058,348 |

**C. Verification of insurance coverage:**

| | | |
|---|---|---:|
| Fidelity bond coverage at end of reporting period | $ | 4,500,000 |
| Mortgage servicing errors and omissions | | |
| coverage at end of reporting period | $ | 4,500,000 |

**D. Excess (deficit) insurance coverage:**

| | | |
|---|---|---:|
| Fidelity bond coverage | $ | 441,652 |
| Required mortgage servicing errors | | |
| and omissions coverage | $ | 441,652 |

**E. Ginnie Mae loss payable endorsement:**

| | |
|---|---:|
| Fidelity bond coverage | Yes |
| Mortgage servicing errors and omissions coverage | Yes |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Required Transmittal/Checklist for Annual Submission of Financial Documents
GNMA Issuer No. 4174
Year Ended December 31, 2016

To whom it may concern:

The following information is being sent to maintain eligibility in the MBS program.   If you have any
questions regarding the items being sent, you may contact Mr. Eric G. Rohr, Chief Financial Officer, of the
organization at telephone 804-665-1659.  Our facsimile number is 804-223-0365.

### Complete items 1 through 7

| | |
|---|---|
| 1. Issuer name: | Live Well Financial, Inc. |
| 2. Issuer address: | 1011 Boulder Springs Drive, Suite 420, Richmond, VA 23225 |
| 3. Issuer's tax identification no.: | 20-2752826 |
| 4. Ginnie Mae I.S. no.: | 4174 |
| 5. FHA mortgagee no.: | 2319800009 |
| 6. Auditor's name: | Keiter |
| and tax identification no: | 54-1631262 |
| 7. Auditor's contact person: | Matthew O. McDonald, CPA |
| and telephone number: | 804-747-0000 |

### Place a checkmark by item(s) submitted

1.   _x_  Annual audited financial statement for period ended 12/31/2016
2.   ____  Auditor's report on consolidating balance sheet and statement of income (if appropriate)
3.   _x_  Auditor's report on internal controls
4.   _x_  Auditor's report on compliance with specific requirements
5.   _x_  Auditor's presentation of insurance requirement
6.   _x_  Auditor's presentation of adjusted net worth for issuer
7.   ____  Auditor's presentation of adjusted net worth for parent (if appropriate)
8.   ____  Corrective action plan (if appropriate)
9.   _x_  Schedule of "other assets"
10. ____  Name. address. and Ginnie Mae issuer number (if applicable) of all affiliates. An
     "affiliate" is defined for these purposes as an organization that is related to the issuer
     through some type of control or ownership as defined by generally accepted accounting
     principles. Use additional page if necessary:

Signature: _____     Date:   March 31, 2017

Type or print signature name:     Eric G. Rohr

Title:   Chief Financial Officer

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Adjusted Net Worth Calculation
GNMA Issuer No. 4224
Year Ended December 31, 2016

**A. Adjusted net worth calculation:**

| | | |
|---|---|---:|
| | Stockholders' equity per statement of financial condition at end of reporting period | $ 93,050,588 |
| Less: | | |
| | Itemized unacceptable assets: | |
| | Total unacceptable assets | - |
| | Adjusted net worth | $ 93,050,588 |

**B. Required net worth calculation:**

| | | |
|---|---|---:|
| | Unpaid principal balance of securities outstanding (Note:  number of pools = 31) | $ 17,485,885 |
| Plus: | | |
| | Outstanding balance of commitment authority issued and requested | 9,466,370 |
| | Total outstanding portfolio and authority | 26,952,255 |
| | Required net worth | $ 39,790,453 |

**C. Excess (deficit) net worth:**

| | | |
|---|---|---:|
| | (Adjusted net worth - required net worth) | $ 53,260,135 |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Capital Requirement Calculation
GNMA Issuer No. 4224
Year Ended December 31, 2016

**A.    Capital requirement for depository institutions:**                    **(Not Applicable)**

| | | |
|---|---|---|
| Tier 1 Capital | $ | - |
| Total capital | $ | - |
| | | |
| Risk-based assets | $ | - |
| Total assets | $ | - |

| | |
|---|---|
| Tier 1 capital/total assets | 0% |
| Tier 1 capital/risk-based assets | 0% |
| Total capital/risk based assets | 0% |

**Meets requirement?**
*(yes/no)*

| | | |
|---|---|---|
| 5% of tier 1 capital/total assets | $ | - |
| 6% of tier 1 capital/risk-based assets | $ | - |
| 10% of total capital/risk based assets | $ | - |

**B.    Capital requirement for nondepository institutions:**

| | | |
|---|---|---|
| Total adjusted net worth | $ | 93,050,588 |
| Total assets | $ | 807,070,288 |

**Meets requirement?**
*(yes/no)*

| | | |
|---|---|---|
| Total adjusted net worth/total assets | 11.53% | Yes |

See Report of Independent Accountants.

**LIVE WELL FINANCIAL, INC.**

Schedule of Liquid Asset Requirement Calculation
GNMA Issuer No. 4224
Year Ended December 31, 2016

**A.    Liquid asset calculation:**

| | | |
|---|---|---|
| Required net worth | | $ 39,790,453 |
| Acceptable liquid assets | | |
| 1. Cash and cash equivalents | $ 80,673,178 | |
| Total liquid assets | | $ 80,673,178 |

**B.    Required liquid assets:**

| | | Meets requirement? |
|---|---|---|
| | | *(yes/no)* |
| **Excess (deficit) liquid** | | |
| (Total liquid assets / required net worth) | 202.75% | Yes |

See Report of Independent Accountants.

43

**LIVE WELL FINANCIAL, INC.**

Schedule of Insurance Requirement
GNMA Issuer No. 4224
Year Ended December 31, 2016

**A. Identification of affiliated Ginnie Mae issuers:**

Affiliated Ginnie Mae issuers:  Live Well Financial, Inc.  - Issuer ID No. 4224
(Issuer name and Ginnie Mae issuer identification number)

Affiliated issuers
on same insurance policies:  None
(Issuer name and Ginnie Mae issuer identification number)

**B. Required insurance calculation:**

| | | |
|---|---|---:|
| Servicing portfolio: | | |
| Ginnie Mae | $ | 17,485,885 |
| Fannie Mae | $ | 91,465,465 |
| Freddie Mac | $ | - |
| Conventional (other) | $ | 2,331,274 |
| Total servicing portfolio | $ | 111,282,624 |
| Required fidelity bond coverage | $ | 316,924 |
| Required mortgage servicing errors and omissions coverage | $ | 316,924 |

**C. Verification of insurance coverage:**

| | | |
|---|---|---:|
| Fidelity bond coverage at end of reporting period | $ | 4,500,000 |
| Mortgage servicing errors and omissions | | |
| coverage at end of reporting period | $ | 4,500,000 |

**D. Excess (deficit) insurance coverage:**

| | | |
|---|---|---:|
| Fidelity bond coverage | $ | 4,183,076 |
| Required mortgage servicing errors | | |
| and omissions coverage | $ | 4,183,076 |

**E. Ginnie Mae loss payable endorsement:**

| | |
|---|---:|
| Fidelity bond coverage | Yes |
| Mortgage servicing errors and omissions coverage | Yes |

See Report of Independent Accountants.

44

**LIVE WELL FINANCIAL, INC.**

Required Transmittal/Checklist for Annual Submission of Financial Documents
GNMA Issuer No. 4224
Year Ended December 31, 2016

To whom it may concern:

The following information is being sent to maintain eligibility in the MBS program.   If you have any
questions regarding the items being sent, you may contact Mr. Eric G. Rohr, Chief Financial Officer, of the
organization at telephone 804-665-1659.  Our facsimile number is 804-223-0365.

### Complete items 1 through 7

| | |
|---|---|
| 1. Issuer name: | Live Well Financial, Inc. |
| 2. Issuer address: | 1011 Boulder Springs Drive, Suite 420, Richmond, VA 23225 |
| 3. Issuer's tax identification no.: | 20-2752826 |
| 4. Ginnie Mae I.S. no.: | 4224 |
| 5. FHA mortgagee no.: | 2319800009 |
| 6. Auditor's name: | Keiter |
| and tax identification no: | 54-1631262 |
| 7. Auditor's contact person: | Matthew O. McDonald, CPA |
| and telephone number: | 804-747-0000 |

### Place a checkmark by item(s) submitted

1.   _x_ Annual audited financial statement for period ended 12/31/2016
2.   ____ Auditor's report on consolidating balance sheet and statement of income (if appropriate)
3.   _x_ Auditor's report on internal controls
4.   _x_ Auditor's report on compliance with specific requirements
5.   _x_ Auditor's presentation of insurance requirement
6.   _x_ Auditor's presentation of adjusted net worth for issuer
7.   ____ Auditor's presentation of adjusted net worth for parent (if appropriate)
8.   ____ Corrective action plan (if appropriate)
9.   _x_ Schedule of "other assets"
10.   ____ Name. address. and Ginnie Mae issuer number (if applicable) of all affiliates. An
        "affiliate" is defined for these purposes as an organization that is related to the issuer
        through some type of control or ownership as defined by generally accepted accounting
        principles. Use additional page if necessary:

Signature: _____     Date:   March 31, 2017

Type or print signature name:   Eric G. Rohr

Title:   Chief Financial Officer

See Report of Independent Accountants.

45



**REPORT OF INDEPENDENT ACCOUNTANTS ON INTERNAL CONTROL OVER
FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS
BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN
ACCORDANCE WITH *GOVERNMENT AUDITING STANDARDS***

To the Board of Directors and Stockholders
Live Well Financial, Inc.
Richmond, Virginia

We have audited, in accordance with auditing standards generally accepted in the United States and
the standards applicable to financial audits contained in *Government Auditing Standards*, issued by
the Comptroller General of the United States, the financial statements of Live Well Financial, Inc.
(the "Company"), which comprise the statement of financial condition as of December 31, 2016, and
the related statements of operations, stockholders' equity, and cash flows for the year then ended
and related notes to the financial statements, and have issued our report thereon March 31, 2017.

**Internal Control Over Financial Reporting**

In planning and performing our audit of the financial statements, we considered the Company's
internal control over financial reporting (internal control) to determine the audit procedures that are
appropriate in the circumstances for the purpose of expressing our opinion on the financial
statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's
internal control. Accordingly, we do not express an opinion on the effectiveness of the Company's
internal control over financial reporting.

A deficiency in internal control exists when the design or operation of a control does not allow
management or employees, in the normal course of performing their assigned functions, to prevent,
or detect and correct, misstatements on a timely basis. A material weakness is a deficiency, or
combination of deficiencies, in internal control, such that there is a reasonable possibility that a
material misstatement of the Company's financial statements will not be prevented, or detected and
corrected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies,
in internal control that is less severe than a material weakness, yet important enough to merit
attention by those charged with governance.

Our consideration of internal control was for the limited purpose described in the first paragraph of
this section and was not designed to identify all deficiencies in internal control that might be material
weaknesses or significant deficiencies. Given these limitations, during our audit we did not identify
any deficiencies in internal control that we consider to be material weaknesses. However, material
weaknesses may exist that have not been identified.

> **Certified Public**
**Accountants & Consultants**
4401 Dominion Boulevard
Glen Allen, VA 23060
T:804.747.0000  F:804.747.3632

www.keitercpa.com

**Compliance and Other Matters**

As part of obtaining reasonable assurance about whether the Company's financial statements are free of material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a material effect on the determination of financial statement amounts.  However, providing an opinion on compliance with those provisions was not an objective of our audit and, accordingly, we do not express such an opinion.  The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards*.

**Purpose of this Report**

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the Company's internal control or on compliance. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Company's internal control and compliance. Accordingly, this communication is not suitable for any other purpose.

March 31, 2017
Glen Allen, Virginia



**REPORT OF INDEPENDENT ACCOUNTANTS ON COMPLIANCE WITH REQUIREMENTS THAT COULD HAVE A DIRECT AND MATERIAL EFFECT ON EACH MAJOR HUD-ASSISTED PROGRAM AND ON INTERNAL CONTROL OVER COMPLIANCE IN ACCORDANCE WITH *CONSOLIDATED AUDIT GUIDE FOR AUDITS OF HUD PROGRAMS***

To the Board of Directors and Stockholders
Live Well Financial, Inc.
Richmond, Virginia

We have audited the compliance of Live Well Financial, Inc. (the "Company") with the compliance requirements described in the *Consolidated Audit Guide of HUD Programs* (the audit guide) that could have a direct and material effect on each of the Company's major U.S. Department of Housing and Urban Development (HUD) programs for the year ended December 31, 2016.  The Company's major HUD programs and the related direct and material compliance requirements are as follows:

| Name of Major HUD Programs | Direct and Material Compliance Requirements |
|---|---|
| Federal Housing Administration (FHA) Title II Loan Program FHA Lender No. 2319800009 | Quality Control Plan, Sponsor Responsibility for Third-Party Originators, Branch Office Operations, Loan Origination, Loan Servicing, Federal Financial and Activity Reports, Lender Annual Recertification, Adjusted Net Worth, Liquidity and Licensing, Loan Settlement, Escrow Accounts, and Kickbacks |
| Ginnie Mae Lender Program GNMA Issuer Nos. 4174 and 4224 | Federal Financial Reports, Eligibility to Issue Ginnie Mae Securities, Review of Custodial Documents, Issuer's Administration of Pooled Mortgages, Review of monthly Accounting Reports and Quarterly Submissions, Securities Marketing and Trading Practices, Adjusted Net Worth, Institutionwide Capital Requirements, and Liquid Asset Requirement |

**Management's Responsibility for Compliance**

Management is responsible for compliance with the requirements of laws, regulations, contracts, and grants applicable to its HUD programs.

**Auditor's Responsibility**

Our responsibility is to express an opinion on compliance for each of the Company's major HUD programs based on our audit of the compliance requirements referred to above.  We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and the audit guide.  Those standards and the audit guide require that we plan and perform the audit to obtain reasonable assurance about whether noncompliance with the compliance requirements referred to above that could have a direct and material effect on a major HUD-assisted program occurred.  An audit includes examining, on a test basis, evidence about the Company's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances.

**Certified Public Accountants & Consultants**
4401 Dominion Boulevard
Glen Allen, VA 23060
T:804.747.0000  F:804.747.3632

www.keitercpa.com

We believe that our audit provides a reasonable basis for our opinion on compliance for each major HUD program. However, our audit does not provide a legal determination of the Company's compliance.

**Opinion on Each Major HUD Program**

In our opinion, the Company complied, in all material respects, with the compliance requirements referred to above that could have a direct and material effect on each of its major HUD programs for the year ended December 31, 2016.

**Other Matters**

We noted certain matters that we are required to report to management of the Company in a separate written communication. These matters are described in our management letter dated March 31, 2017.

**Report on Internal Control Over Compliance**

Management of the Company is responsible for establishing and maintaining effective internal control over compliance with the compliance requirements referred to above. In planning and performing our audit, we considered the Company's internal control over compliance with the requirements that could have a direct and material effect on each major HUD program to determine the auditing procedures that are appropriate in the circumstances for the purpose of expressing our opinion on compliance for each major HUD program and to test and report on internal control over compliance in accordance with the audit guide, but not for the purpose of expressing an opinion on the effectiveness of internal control over compliance. Accordingly, we do not express an opinion on the effectiveness of the Company's internal control over compliance.

A deficiency in internal control over compliance exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, noncompliance with a compliance requirement of a HUD program on a timely basis. A material weakness in internal control over compliance is a deficiency, or combination of deficiencies, in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a compliance requirement of a HUD program will not be prevented, or detected and corrected, on a timely basis. A significant deficiency in internal control over compliance is a deficiency, or a combination of deficiencies, in internal control over compliance with a compliance requirement of a HUD program that is less severe than a material weakness in internal control over compliance, yet important enough to merit attention by those charged with governance.

**Report on Internal Control Over Compliance, Continued**

Our consideration of internal control over compliance was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over compliance that might be material weaknesses or significant deficiencies and therefore, material weaknesses or significant deficiencies may exist that were not identified.  We did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of the audit guide. Accordingly, this report is not suitable for any other purpose.

March 31, 2017
Glen Allen, Virginia

**LIVE WELL FINANCIAL, INC.**

Schedule of Findings, Questioned Costs, and Recommendations
Year Ended December 31, 2016

Our audit disclosed no audit findings that are required to be reported herein under the HUD Consolidated Audit Guide.

See Report of Independent Accountants

**LIVE WELL FINANCIAL, INC.**

Schedule of the Status of Prior Audit Findings, Questioned Costs, and Recommendations
Year Ended December 31, 2016

Our audit disclosed no prior audit findings that are required to be reported herein under the HUD Consolidated Audit Guide.

See Report of Independent Accountants

**LIVE WELL FINANCIAL, INC.**

Corrective Action Plan
FHA Lender No. 2319800009
Keiter
Year Ended December 31, 2016

Name of auditee:                         Live Well Financial, Inc.

HUD auditee identification number:   2319800009

Name of audit firm:                       Keiter

Period covered by the audit:           1/1/2016 – 12/31/2016

Corrective action plan prepared by:

      Name:                            Eric Rohr

      Position:                        Chief Financial Officer

      Telephone Number:          (804) 665-1659

A.   **Current Findings on the Schedule of Findings, Questioned Costs, and Recommendations**

      Not applicable

B.   **Status of Corrective Actions on Findings Reported in the Prior Audit Schedule of Findings, Questioned Costs, and Recommendations**

      Not applicable

See Report of Independent Accountants