IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FLAGSTAR BANK, FSB,
    Plaintiff,

v.                                                                          Civil No. 3:21cv568 (DJN)

KEITER, STEPHENS, HURST, GARY
& SHREAVES, *A Professional Corporation*
*d/b/a Keiter CPA*
    Defendant.

## MEMORANDUM OPINION

Plaintiff Flagstar Bank, FSB ("Flagstar") brings this action against Defendant Keiter, Stephens, Hurst, Gary & Shreaves, A Professional Corporation d/b/a Keiter CPA ("Keiter") alleging fraud, aiding and abetting fraud, and negligent misrepresentation arising from Keiter's audits of non-party Live Well Financial, Inc. ("Live Well") from 2015 to 2019. This matter now comes before the Court on the Motion to Dismiss (the "Motion" (ECF No. 9)) filed by Keiter.

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion. Specifically, the Court DENIES Defendant's Motion as to Count One of the Complaint (ECF No. 1). However, the Court GRANTS Defendant's Motion as to Counts Two and Three.

## I.    BACKGROUND

At this stage, the Court must accept as true the facts set forth in the Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving Defendant's Motion.

### A.    Factual Background

Plaintiff Flagstar's claims arise out of non-party Live Well's long-running fraud, and Defendant Keiter's failure, as Live Well's auditor, to detect that fraud over a period of almost five years. (Compl. ¶ 1.) Before its collapse, Live Well, a Virginia-based corporation, originated and serviced reverse mortgages. (Compl. ¶ 18.) From 2015 until 2019, Live Well portrayed itself as a thriving business when, in fact, it proved deeply insolvent. (Compl. ¶ 1.) Live Well misrepresented its financial standing by fraudulently inflating the value of its largest asset, an illiquid bond portfolio. (Compl. ¶ 1.) Each year in its annual audits, Keiter, a Virginia Professional Corporation, signed off on Live Well's manufactured financial statements without detecting the fraud. (Compl. ¶ 2.) Keiter made those statements despite conducting "woefully deficient" audits with knowledge that third parties would rely on them. (Compl. ¶¶ 4, 12.) Indeed, Flagstar, a federally chartered bank based in Michigan, relied on those statements and loaned Live Well $70 million. (Compl. ¶¶ 9-10.) When the underlying fraud came to light, resulting in the criminal convictions of three of its officers, Live Well went into bankruptcy, and Flagstar lost $30 million. (Compl. ¶¶ 1, 9-10.)

### 1.    Live Well's Underlying Fraud

In 2014, Live Well began to acquire a large portfolio of illiquid bonds (the "Bonds") that it used to raise money, including by pledging them as collateral for loans. (Compl. ¶¶ 19-20.) The Bonds did not have readily available market prices, because they constituted thinly traded assets. (Compl. ¶ 21.) Thus, to represent their worth to lenders as collateral, Live Well hired a third-party pricing service to value the Bonds. (Compl. ¶ 21.) However, instead of independently calculating the Bonds' value, the pricing service agreed to publish Live Well's own higher quotes verbatim. (Compl. ¶ 22.)

2

Live Well then grossly inflated the value of its Bonds portfolio, allowing it to borrow more money collateralized by the fraudulently inflated collateral. (Compl. ¶ 23.) Occasionally, Live Well committed these frauds brazenly, including at least two occasions when it sent the pricing service enlarged valuations of "round number increases across a group of bonds, untethered to any analysis." (Compl. ¶ 24.) Live Well inflated the Bonds apart from market conditions to generate immediate cash as a "self-generating money machine." (Compl. ¶ 25.)

### 2.      Flagstar's Loan to Live Well

In March 2017, Flagstar entered into a Loan and Security Agreement (the "Credit Facility" (ECF No. 10-5)) with Live Well collateralized by select bonds (the "Collateral Bonds") from within the Bonds portfolio. (Compl. ¶ 27.) While Flagstar initially lent Live Well $50 million, the amount increased to $70 million by October 2017. (Compl. ¶¶ 27-28.) The Credit Facility protected Flagstar from the risk of default by providing that the amount outstanding on the loan could not exceed 80% of the Collateral Bonds' "market value." (Compl. ¶ 29.) Additionally, Flagstar would adjust the loan downward if the market value of the Collateral Bonds declined by 15%. (Credit Facility § 1.1 at 7.) The Credit Facility defined "market value" as the amount determined by Interactive Data Corporation ("IDC") "or other independent third party reasonably acceptable to [Flagstar.]" (Compl. ¶ 30; Credit Facility § 1.1 at 13.)

U.S. Bank served as custodian of the Collateral Bonds and held them in a custodial account over which Flagstar had exclusive control. (Credit Facility § 1.1 at 9.) Flagstar had online access to the custodial account, including daily valuations of the Collateral Bonds in that account, and the right to demand additional documents and information on the Collateral Bonds

as a condition of closing, advances, or perfecting Flagstar's security interest. (Credit Facility §§ 4.1.5, 4.1.6, 5.6.)

As a condition of entering into the Credit Facility, Flagstar required Live Well to provide audited Financial Statements for 2015 and 2016, as well as annually thereafter. (Compl. ¶¶ 31-32.) These statements for 2015 through 2018 (the "Financial Statements") falsely represented that Live Well was solvent and held substantial shareholders' equity. (Compl. ¶ 33.) The Financial Statements also represented that the Bonds constituted Live Well's largest asset and that their valuation came from a third-party pricing service. (Compl. ¶ 34.)

Additionally, each of the Financial Statements included a Report of Independent Accountants (the "Reports" (ECF Nos. 10-1 through 10-4)), prepared by Keiter, that gave Keiter's "clean" opinion of Live Well's Financial Statements. (Compl. ¶¶ 37-41.) Keiter's Reports represented that, in evaluating the Financial Statements, it reviewed Live Well's internal controls and followed generally accepted accounting standards to ensure that the Financial Statements proved free from material misstatements. (Compl. ¶¶ 37, 39-40.) Flagstar relied on both the Financial Statements and the Reports in entering into and maintaining the Credit Facility with Live Well. (Compl. ¶¶ 30, 41.)

### 3.    Keiter's Deficient Audits

However, Keiter's audits violated the applicable standards and industry practices by simply rubber-stamping the valuations reported by Live Well management. (Compl. ¶¶ 54-60.) When auditing illiquid assets such as the Bonds, the auditing standards set forth by the American Institute of CPAs require an auditor to exercise "professional skepticism." (Compl. ¶¶ 45-53 (citing American Institute of Certified Public Accountants (AICPA), *Clarified Statements on Auditing Standards* § 540).) The standards require that an auditor understand the entity and its

4

environment "to identify and assess the risks of material misstatement, whether due to fraud or error," including by paying special attention to the entity's internal controls. (Compl. ¶ 46.) Where the entity has employed a specialist, the auditor should analyze the specialist's work, and consider hiring its own specialist if it does not have the expertise to evaluate the entity's specialist's work. (Compl. ¶¶ 48-49, 52.)

Accordingly, the standards did not allow Keiter to simply rely on IDC's pricing valuations. (Compl. ¶ 50.) Instead, they required Keiter to understand IDC's work and assess whether ample evidence supported its valuations. (Compl. ¶ 50.) Keiter violated these standards by failing to actually review the work conducted by IDC, the evidence underlying the Bonds' valuations, or their pricings over time. (Compl. ¶ 55-56.) Neither did Keiter consult a third-party pricing service other than IDC, hire a specialist, nor develop its own valuation to evaluate Live Well's own valuation. (Compl. ¶¶ 56-59.) Ultimately, Keiter's audits failed to reveal any concerns in Live Well's Financial Statements, even though Keiter audited Live Well just months before Live Well entered involuntary bankruptcy. (Compl. ¶ 9.)

In spite of these shortcomings, Keiter's annual Reports stated that the accompanying Financial Statements from Live Well "present fairly, in all material respects, the financial position of Live Well Financial, Inc. as of [the relevant year-end date], and the results of its operations, changes in stockholders' equity, and its cash flows for the year[s] then ended in accordance with accounting principles generally accepted in the United States." (Compl. ¶ 38.) Keiter's annual audits constituted at least three false statements: (1) that the Financial Statements "present fairly" Live Well's financial position, (2) that Live Well had a positive shareholders' equity, when in fact "it was deeply insolvent," and (3) that Keiter conducted its audits according to the applicable standards. (Compl. ¶¶ 42, 60, 68.)

### 4.   Flagstar's Loss

In May 2019, Live Well's fraud came to light and it ceased doing business. (Compl. ¶ 61.) Live Well defaulted on the Credit Facility and went into bankruptcy in June of that year. (Compl. ¶ 61.) At the time, Live Well owed Flagstar about $68 million in principal and about $134,000 in interest on the Credit Facility. (Compl. ¶ 62.) In September 2019, Flagstar received control of the Collateral Bonds and sold them for about half of their represented value. (Compl. ¶ 63.) Resultantly, Flagstar suffered a loss of about $30 million on the Credit Facility. (Compl. ¶ 64.) Thereafter, Flagstar partially recovered from other parties and currently holds an outstanding loss in excess of $10 million. (Compl. ¶ 65.)

### B.   Plaintiff's Complaint

On September 1, 2021 Plaintiff filed its Complaint against Defendant, raising three counts for relief based on the above allegations. Count One asserts a claim of fraud against Keiter, alleging that its clean opinion accompanying Live Well's Financial Statements constituted a false statement of material fact made with the intent to deceive, and that Flagstar relied upon it to its detriment. (Compl. ¶¶ 66-73.) Count Two asserts a claim of aiding and abetting fraud against Keiter, alleging that it substantially assisted Live Well in defrauding Flagstar by giving a clean review to Live Well's annual Financial Statements. (Compl. ¶¶ 74-80.) Count Three asserts a claim of negligent misrepresentation against Keiter, alleging that Keiter gave its clean opinion at least negligently by not auditing Live Well according to generally accepted accounting principles. (Compl. ¶¶ 81-88.) Based on these claims, Plaintiff seeks damages as found appropriate at trial, currently believed to amount to at least $10 million, punitive damages, pre- and post-judgment interest, and the award of costs and reasonable attorneys' fees. (Compl. at 20.)

6

### C.    Defendant's Motion

In response to Plaintiff's Complaint, on November 1, 2021, Defendant filed a Motion to Dismiss (ECF No. 9), moving to dismiss Plaintiff's claims against it for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  In support of its Motion, Keiter argues that "Flagstar's true claim is one for professional negligence it lacks standing to bring, masquerading as a claim for fraud to get past the courthouse door." (Mem. of Law in Supp. of Keiter CPA's Mot. to Dismiss ("Def.'s Mem.") at 13 (ECF No. 10).)  Specifically, Keiter argues that Count One fails, because (1) Flagstar fails to allege facts from which the Court can reasonably infer that Keiter issued its audit opinion with the intent to deceive, and (2) Flagstar's alleged reliance proved not reasonable or justified.  (Def.'s Mem. at 12-21.)  Keiter also argues that Count Two fails to state a claim, because (1) Virginia has not recognized aiding and abetting fraud as a proper civil cause of action, and (2) if proper, Flagstar has not adequately alleged scienter, as in its fraud claim.  (Def.'s Mem. at 21-25.)  Finally, Keiter argues that Count Three fails, because (1) Flagstar's alleged reliance proved not reasonable, and (2) Virginia's "economic loss" and "source of duty" doctrines preclude a negligence claim.  (Def.'s Mem. at 25-30.)

On November 23, 2021, Flagstar filed its Response in Opposition, arguing that Michigan law applies and that it holds auditors liable to foreseeable third parties in circumstances such as these. (Pl.'s Mem. of Law in Opp'n To Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 11-13 (ECF No. 14).)  On December 2, 2021, Keiter filed its Reply (Keiter's Reply to Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Def.'s Reply") (ECF No. 15)), rendering Keiter's Motion now ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint must assert more facts than those "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must suffice to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

For the purposes of deciding a motion to dismiss, the Court will only consider those factual allegations set forth in the Complaint. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Additionally, the Court may consider documents attached to the Complaint, Fed. R. Civ. P. 10(c), as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Where, as here, the Complaint expressly relies upon a document integral to the Complaint that the plaintiff did not attach, the Court can also consider that document on a motion to dismiss.[1] *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) ("[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'") (quoting *Phillips*, 190 F.3d at 618). Where the bare allegations of the Complaint conflict with any document incorporated therein, the document prevails. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

### III.    ANALYSIS

The Court will first address the parties' threshold argument over which state's law governs Plaintiff's claims before turning to the merits of each cause of action.

#### A.    Choice of Law

The parties dispute which state's law governs Plaintiff's claims, with Plaintiff claiming that Michigan law applies, and Defendant arguing that Virginia law applies. Because Flagstar relies on the Court's diversity jurisdiction, the Court must apply the substantive law of the state

---

[1]    Although relying on the Credit Facility, Financial Statements and Reports, Flagstar did not attach them to its Complaint. However, Keiter filed these documents as attachments to its memorandum in support of its motion to dismiss.

in which its sits, including its choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). As a federal court sitting in Virginia, the Court applies Virginia's well-established choice-of-law rule that "it is the place of the wrong (*lex loci delicti*) that determines which State's substantive law applies in a tort action brought in Virginia." *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (italics supplied) (citing *McMillan v. McMillan*, 253 S.E.2d 662, 663 (Va. 1979)). Virginia defines the place of the wrong "as the place where the last event necessary to make [the party] liable for an alleged tort takes place." *Quillen*, 789 F.2d at 1044.

Flagstar argues that Michigan law applies, because, in the context of fraud, "the place of the wrong is where the loss is sustained, not where the fraudulent representations are made." (Pl.'s Resp. at 17 (quoting *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003) (quoting *Jordan v. Shaw Indus., Inc.*, 1997 WL 734029, *3 (4th Cir. Nov. 26, 1997) (unpublished disposition))).) Here, Flagstar asserts that, "although Keiter conducted the audit entirely in Virginia, Flagstar relied on the Financial Statements and Accountants' Reports in Michigan." (Pl.'s Resp. at 18.)

Keiter counters that Virginia law applies, because, in Virginia, the *lex loci delicti* inquiry "looks *at where the allegedly tortious conduct took place, not where the effects of that conduct may be felt.*" (Def.'s Reply at 4 (quoting *JTH Tax, Inc. v. Williams*, 310 F. Supp. 3d 648, 657 (E.D. Va. 2018) (emphasis added by Keiter)).) In this case, Keiter states, all of its alleged tortious conduct occurred in Virginia: "Keiter entered into contract with Live Well in Virginia; that contract was itself governed by the laws of Virginia; and all of Keiter's contractual services were performed and its Reports delivered to Live Well in Virginia." (Def.'s Reply at 4.)

However, none of this conduct would constitute fraud apart from a party's detrimental reliance on the representations.

Keiter mischaracterizes Flagstar's argument for Michigan law as focusing on the effects of the tort, which would contravene the principles underlying Virginia's *lex loci* approach. (*See, e.g.*, Def.'s Reply at 6 ("'Delicti' translates to 'wrong' or 'crime,' not injury, and is consistently applied with that meaning in Virginia courts in all tort cases.")) However, Flagstar properly homes in on where it relied on the false statements, because that constitutes the final element of each of the various fraud claims alleged. The fact that that location coincides with where Plaintiff felt the effects of the fraud proves inconsequential.

For example, in *Waterside Capital Corp. v. Hales, Bradford & Allen, LLP*, this Court, sitting in diversity, faced a substantially similar accountant liability claim and found that the law of the place where the reliance occurred governed the tort claims. 2007 WL 2254661, at *4-5 (E.D. Va. Aug. 3, 2007) (Smith, J.), *aff'd*, 319 F. App'x 263 (4th Cir. 2009). There, plaintiffs, a pair of investors, alleged that they relied on annual audits in deciding to extend financing to a Virginia corporation. *Id.* at *2. Although the Texas-based auditor prepared the audits entirely in Texas under a contract governed by Texas law, the investors received the audits by mail in Norfolk, Virginia, where they relied on the reports by extending loans to the corporation. *Id.* at *2-3. Applying Virginia's *lex loci* approach, the Court held that "the law of the state where a plaintiff received and acted upon a defendant's representations controls a fraud claim." *Id.* at *4. The Court proceeded to find that Virginia law controlled, because plaintiffs "received and relied upon" the reports in Norfolk, where they "made the decision to provide the loans." *Id.* at *5.

In this case, the Court similarly concludes that Michigan law applies to Plaintiff's claims, because Flagstar's alleged reliance on Live Well's Financial Statements and Keiter's Reports

11

occurred at its headquarters in Michigan, where it issued the loans. Keiter's lack of business activities in Michigan proves irrelevant under Virginia's *lex loci* analysis, because the place of the wrong's law applies "even if the actor has no control over the location of that last event." *St. Paul Fire & Marine Ins. Co. v. Hoskins*, 2012 WL 748574, at *4 (W.D. Va. Mar. 7, 2012) (citing *Quillen*, 789 F.2d at 1044). Although Keiter cites one case where a district court applied Virginia law although the reliance occurred elsewhere, the weight of authority contradicts that position and persuades the Court that the law of Michigan should apply.[2]

---

[2]      *Compare Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 690 (E.D. Va. 1990) (finding, although reliance occurred in Mexico, that "Defendants' fraudulent acts occurred chiefly in Virginia. Accordingly, Virginia law controls plaintiffs' common law fraud claims.") *with Jordan*, 1997 WL 734029 at *3 (4th Cir. Nov. 26, 1997) (unpublished disposition) (quoting Restatement (First) of Conflicts of Laws § 377, n. 4 (1934) ("When a person sustains loss by fraud , the place of the wrong is where the loss is sustained, not where the fraudulent representations are made.") and holding that "the district court did not err in choosing, as the law governing the fraud claims, the law of the State in which each plaintiff respectively was headquartered and received defendant's . . . [misrepresentations]"), *and In re Volkswagen "Clean Diesel" Litig.*, 94 Va. Cir. 189 (City of Fairfax 2016) (applying Tennessee fraud standard under *lex loci*, because "[a]ny possible reasonable reliance took place in Tennessee when the purchase was made"), *and AvalonBay Communities, Inc. v. Willden*, 2009 WL 2431571, *6 n.5 (E.D. Va. Aug. 7, 2009), *aff'd*, 392 F. App'x 209 (4th Cir. 2010) (applying Virginia law to claims of fraud, business conspiracy, tortious interference, and aiding and abetting a breach of fiduciary duty where the plaintiff "reasonably relied on the fraudulent invoices in Virginia and cut checks . . . in Virginia"), *and Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007) (holding, in a fraud and conspiracy case, that "the law of the forum where the party allegedly defrauded is headquartered governs tort claims as such locale is both the place where such party relied on the false representations and where its loss was sustained"), *and Insteel Indus., Inc.*, 276 F. Supp. 2d at 486-87 (applying North Carolina fraud standard to a claim arising out of a Virginia construction project, because the plaintiff relied upon and paid the false invoices from plaintiff's corporate headquarters in North Carolina), *and St. Paul Fire & Marine Ins. Co.*, 2012 WL 748574, at *4 ("In this case, the last act necessary for each of the claims asserted is the reasonable reliance by American Woodwork on the allegedly fraudulent invoices and payments, which took place in Virginia when it paid the lumber invoices and processed the wood scrap payments in its corporate offices in Winchester. As the loss was sustained in Virginia, the court will apply Virginia law to the state claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, common law conspiracy, and violation of the state business conspiracy statute.").

### B.    Fraud

Michigan's Accountant Liability Act specifically defines two circumstances in which a non-client may hold an accountant liable for torts arising out of their professional services: actual fraud by the accountant, discussed here; and negligence or other conduct, discussed in Part D below.  Mich. Comp. Laws § 600.2962(1).  Regarding actual fraud, the statute provides that "[a] certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant [for] . . . . (b) An act, omission, decision, or conduct of the certified public accountant that constitutes fraud or an intentional misrepresentation." *Id.*  Accordingly, the Court looks to Michigan common law for the elements of fraud.  *See Yadlosky v. Grant Thornton, L.L.P.*, 120 F. Supp. 2d 622, 634-35 (E.D. Mich. 2000) (analyzing fraud claim against accounting firms under Michigan common law).

In Michigan, a plaintiff asserting a cause of action for actionable fraud must prove with a reasonable degree of certainty the following elements:  "(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012) (quoting *Candler v. Heigho*, 175 N.W. 141, 143 (Mich. 1919) *overruled in part on other grounds by U. S. Fid. & Guar. Co. v. Black*, 313 N.W.2d 77 (Mich. 1981).

Flagstar bases its fraud claim on Keiter's "clean" audit opinions.  In each of the Reports, Keiter gave its professional opinion that Live Well's Financial Statements "present fairly, in all material respects, the financial position of Live Well Financial, Inc. as of [the relevant year-end dates], and the results of its operations, changes in stockholders' equity, and its cash flows for

the year[s] then ended in accordance with accounting principles generally accepted in the United States." (Compl. ¶¶ 38, 67; Financial Statements at 4 (ECF No. 10-1 through 10-4).)  Flagstar alleges that these opinions constitute at least three false statements. (Compl. ¶ 68.)  Specifically Flagstar asserts that the opinions falsely stated (1) that the Financial Statements "present fairly" Live Well's financial position, (2) that Live Well had a positive shareholders' equity, when in fact "it was deeply insolvent," and (3) that Keiter conducted its audits according to the applicable standards. (Compl. ¶ 68.)  Although arguing under Virginia's fraud rubric, Keiter contests only whether the Complaint properly alleges (1) scienter — Keiter's intent to mislead Flagstar — and (2) that Flagstar's alleged reliance proved reasonable or justified. (Def.'s Mem. at 12-21.)

####    1.    **Flagstar Adequately Alleges Scienter.**

Keiter argues that Flagstar's fraud claim fails, because it "fails to allege *facts* from which it can reasonably be inferred that Keiter issued its audit opinion with the intent to deceive Flagstar." (Def.'s Mem. at 14.)  Rather, Keiter asserts, Flagstar makes its allegations of scienter "in conclusory, check-the-box fashion." (Def.'s Mem. at 14-15 (quoting Compl. ¶ 71 (Keiter gave its opinion on Live Well's Financial Statements "*with intent to defraud*, in that it was at least reckless as to the truth or falsity of its statements in the audit.")).)  According to Keiter, the actual facts in the Complaint merely support an inference that Keiter performed its audits with professional negligence, not that Keiter had the specific intent to mislead. (Def.'s Mem. at 16.)

While a plaintiff may establish scienter by alleging an intent to mislead, it may also satisfy this element by alleging that the defendant made the false statements recklessly. *Titan Ins. Co.*, 817 N.W.2d at 567.  In the substantially similar securities fraud Rule 10b-5 context, the Sixth Circuit has defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542,

550 (6th Cir. 1999). Because giving a baseless clean audit opinion of a company's financial statements would constitute an extreme departure from the standards of ordinary care, Flagstar need only allege that Keiter failed to complete its audits in a manner that supported its representations in the Reports.

Moreover, although Federal Rule of Civil Procedure 9(b) requires a party claiming fraud or mistake to "state with particularity the *circumstances* constituting fraud or mistake," it allows that "[m]alice, *intent*, knowledge, and other conditions of a person's mind *may be alleged generally*." (emphasis supplied). And, district courts in Michigan have found that "knowing or reckless language must be construed liberally in plaintiff's favor for purposes of a motion to dismiss." *In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1252 (W.D. Mich. 1991) (citing *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 713 F. Supp. 1019, 1025 (W.D. Mich. 1989), *aff'd sub nom. Mercer v. Jaffe, Snider, Raitt & Heuer*, 933 F.2d 1008 (6th Cir. 1991)). Still, in pleading the conditions of a person's mind generally, a plaintiff may not "evade the less rigid — though still operative — strictures of Rule 8." *Iqbal*, 556 U.S. at 686-87.

Keiter argues that the Court should follow *Yadlosksy* and dismiss the fraud claim, because, at best, Flagstar's allegations merely establish a professional duty and do not give rise to a strong inference of recklessness. (Def.'s Reply at 13-14.) In *Yadlosky*, the Court dismissed the plaintiff's Michigan common law fraud claim for failure to allege scienter, incorporating its reasoning by which it also dismissed plaintiff's Rule 10b-5 securities fraud claim. 120 F. Supp. 2d at 635. In dismissing the securities fraud claim, the court stated that "[m]erely failing to follow [generally accepted accounting practices] is insufficient to state a securities fraud claim." *Id.* at 626 (citing *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999)). The court elaborated on what would adequately allege scienter:

15

[t]he [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)).

Ultimately, the court found that the plaintiff had only alleged one fact, that the defendant auditors published their complained of professional opinions. *Id.* at 631. This fact merely supported an inference that the accountant defendants possessed "the motive and opportunity to commit securities fraud" rather than giving rise to a strong inference of recklessness. *Id.* at 631.

Here, in contrast, Flagstar has plausibly alleged that Keiter gave its clean review of Live Well's Financial Statements at least recklessly. The Complaint makes this allegation generally, as permitted under Rule 9(b). (Compl. ¶ 71 ("Keiter made the false statements with intent to defraud, in that it was at least reckless as to the truth or falsity of its statements in the audit.").) The Court need not decide whether that statement alone would suffice to allege recklessness, because the circumstantial evidence alleged lends further support to this theory and bolsters the plausibility of Flagstar's claims.

Flagstar alleges that Keiter gave its clean opinion of Live Well's Financial Statements each year in spite of conducting "woefully deficient" audits. (Compl. ¶ 4.) Flagstar describes the accounting standards applicable to Keiter's audits of Live Well, including its obligation to understand and scrutinize the third-party pricing source's valuation of the Bonds. (Compl. ¶¶ 43-53.) It goes on to allege that the standards required heightened enquiry due to the risk of fraud generated by evaluating illiquid securities. (Compl ¶¶ 46, 51-53.) It describes the manner that a firm should audit valuations of illiquid securities and how Keiter could have done so. (Compl. ¶¶ 46-51.) Ultimately though, it alleges that Keiter did not. (Compl. ¶¶ 56-60.)

Flagstar alleges that Keiter "violated each of the standards and industry practices set forth above." (Compl. ¶ 55.)  Specifically, Flagstar states that Keiter "did not actually review the work conducted by Live Well's pricing service, the inputs into the valuations . . . or the changes in those valuations over time." (Compl. ¶ 56.)  Additionally, Keiter "did not obtain prices from a pricing service other than the one retained by Live Well . . . . develop [its own] point estimate or range to evaluate management's point estimate . . . . or retain a specialist to assist it, notwithstanding that it plainly lacked the expertise to audit the prices of [the Bonds.]" (Compl. ¶¶ 57-59.)  As such, a finder of fact could reasonably infer that Keiter's approval of Live Well's Financial Statements constituted an extreme departure from the standard of care required of Keiter in the circumstances.

### 2.    Flagstar Adequately Alleges Reliance.

Additionally, Keiter argues that Flagstar's fraud claim fails, because Flagstar did not reasonably and justifiably rely on Keiter's representations. (Def.'s Mem. at 16-21.)  Keiter argues that, under Virginia law, Keiter's reliance proved unreasonable and not justified, because Keiter had direct access to information on its Collateral Bonds and, in maintaining the Credit Facility, also relied on information from sources other than Keiter. (Def.'s Mem. at 16-21.)  Accordingly, Flagstar could have uncovered the Live Well fraud itself. (Def.'s Mem. at 21.)  Flagstar responds that Keiter's argument proves futile, because Michigan law does not require Flagstar to establish that it could not have discovered the fraud for itself. (Pl.'s Resp. at 19-21.)

In *Field v. Mans*, the United States Supreme Court surveyed the national landscape of common law requirements for reliance in a fraud claim, describing three tiers that descend in rigor:  (1) "reasonable reliance," (2) "an intermediate level of reliance, most frequently referred to as justifiable reliance," and (3) "mere reliance in fact." 516 U.S. 59, 72-73 (1995). Quoting

17

the Restatement (Second) of Torts (1976), the Court described "justifiable reliance," stating "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 72 (quoting § 545A, Comment *b*).  Accordingly, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* (quoting Restatement (Second) of Torts (1976) § 540).

 The Court then proceeded to identify Michigan as a justifiable reliance state. *Id.* at 73 n.12 (citing *Boss v. Tomaras*, 217 N.W. 783 (Mich. 1928) (finding right to rely without investigation)).  By contrast, it described Virginia as a reasonable reliance state. *Id.* at 72 n.10 (citing *Horner v. Ahern,* 153 S.E.2d 216, 219 (Va. 1967) (stating that, if purchaser is given information that would excite suspicions of reasonably prudent man, he has a duty to investigate)).  Complicating this classification, Keiter identifies several cases in which Michigan courts describe the reliance requirement in terms of "reasonableness." (Def.'s Reply at 14 (citing *Bergen v. Baker*, 691 N.W.2d 770, 778 (Mich. Ct. App. 2004); *Nieves v. Bell Indus., Inc.,* 517 N.W.2d 235, 238 (Mich. Ct. App. 1994); *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 664 (6th Cir 2013)).) However, Keiter agrees that regardless of the terminology employed, the key distinction between the tiers remains the same:  the degree of diligence the law requires a party to exercise before they may prevail on a claim of fraud.  (Def.'s Reply at 14.)

 In Michigan, whether described as "reasonable" or "justifiable," the law does not require a defrauded party to investigate the possibility of fraud before relying on the representations of another. *Boss*, 217 N.W. at 783.  In *Boss,* the underlying dispute arose from the purchase of a farm, after which the plaintiffs discovered that the "defendants' representations with reference to

18

the quality of the soil, the extent of the woodland, and the condition of the farm tools were

false." *Id.* The Supreme Court of Michigan reviewed a jury instruction that stated, "you will

next consider and determine whether the plaintiff knew, *or had any means of knowing, such

representations were false*." *Id.* (emphasis supplied). The court held that:

> This instruction placed upon plaintiffs a greater duty than the law does. A fair
> inference from the sentence complained of is that, if plaintiffs did have the means
> of knowing, they should be diligent and discover the untruthfulness of the
> representations. If this were the rule, the consequences following nearly every
> fraud might be avoided by the defendant.

*Id.* (citing *John Schweyer & Co. v. Mellon*, 162 N.W. 1006 (Mich. 1917); *Schnepper v. Halleb*,

198 N.W. 943 (Mich. 1924)).

The law remains unchanged almost a century later. In *Titan Ins. Co.*, the Supreme Court

of Michigan continued to apply this principal, holding that no fraud doctrine in Michigan

"requires that the party asserting fraud prove that the fraud could not have been discovered

through the exercise of reasonable diligence." 817 N.W.2d at 569. There, the court found an

insurance carrier entitled to rely on the statement of the insurance applicant that no one in her

household had a suspended driver's license, even if it would have proved "easily ascertainable"

that, in fact, the state had suspended her daughter's license for multiple violations. *Id.* at 565-66,

577. In so holding, the court reversed the Court of Appeals and cabined a line of cases requiring

due diligence to scenarios in which "the allegedly defrauded party was given direct information

refuting the misrepresentations" but chose to ignore it. *Id.* at 568 n.4 (citing *Nieves*, 517 N.W.2d

at 238; *Montgomery Ward & Co. v. Williams*, 47 N.W.2d 607, 611 (Mich. 1951); *Webb v. First

of Michigan Corp.*, 491 N.W.2d 851, 853 (Mich. Ct. App. 1992)). The court opined, "[i]gnoring

information that contradicts a misrepresentation is considerably different than failing to

affirmatively and actively investigate a representation." *Id.*

*Nieves v. Bell Industries* illustrates the type of fact pattern that requires due diligence of a plaintiff alleging fraud.  In *Nieves*, the defendant, Bell Industries, hired the plaintiff, Nieves, as a general manager in an at-will employment agreement.  517 N.W.2d at 237.  Nieves' job application, employee handbook and compensation agreement each represented that Bell Industries could terminate his employment at any time at the will of the employer, and that only the company's president or vice president could alter the at-will contractual term.  *Id.* Nevertheless, Nieves ignored these provisions and chose to rely on the oral assurances of the person who conducted his interview, Lerner, that those terms did not apply to Nieves and that Bell Industries could not arbitrarily terminate him.  *Id.*  When Bell Industries terminated Nieves a few months later, he sued for fraud.  *Id.*  The Court of Appeals of Michigan held that Nieves could not have relied on Lerner's oral misrepresentation when the employment documents plainly contradicted those promises.  *Id.* at 238.

Unlike in *Nieves*, the circumstances alleged here did not require Plaintiff to exercise due diligence to investigate Keiter's misrepresentations.  Here, Flagstar alleges that it relied upon Keiter's clean audit of Live Well's Financial Statements and accompanying Reports.  Although the Credit Facility gave Flagstar access to certain information about the Collateral Bonds, the Complaint does not allege that this presented Flagstar with information contradicting Keiter's Reports.  The Credit Facility also provided Flagstar with online access to daily price quotes for the illiquid Collateral Bonds and entitled Flagstar to documentation from Live Well to perfect its security interest.  The facts alleged do not suggest that these sources of information contradicted Keiter's audits either.  Thus, Michigan law does not require Flagstar to have exercised diligence to uncover Keiter's misrepresentations.  *See Titan Ins. Co.*, 817 N.W.2d at 568 n.4 ("[I]t is true that 'fraud is not perpetrated upon one who has full knowledge to the contrary of a

20

representation.' But there is no common-law duty to attempt to acquire such knowledge." (cleaned up)). Discovery may ultimately reveal that Flagstar had access to information refuting Keiter's audits and chose to ignore it. However, on the facts as alleged, the Court cannot conclude that Flagstar failed to allege its reliance on Keiter's representations.

Therefore, having found that the Complaint sufficiently alleges fraud, the Court hereby DENIES Defendant's Motion as to Count One.

### B.     Aiding and Abetting Fraud

The Michigan Supreme Court has not expressly recognized a cause of action for aiding and abetting fraud or other tortious conduct. *El Camino Res. Ltd. v. Huntington Nat. Bank*, 712 F.3d 917, 922 (6th Cir. 2013). However, after surveying several Michigan Court of Appeals cases that have recognized aiding and abetting a tort, the Sixth Circuit held in *El Camino* that "the Michigan Supreme Court, if faced with the opportunity to do so, would adopt the approach of aiding and abetting as set forth in § 876(b) of the Restatement (Second) of Torts." *Id.* Following this approach, a claim of aiding and abetting fraud would require proof of the underlying fraud, "knowledge of wrongful conduct by the aider/abettor; and . . . substantial assistance of the wrongful conduct by the aider/abettor." *Id.*

Defendant argues that the Court should not recognize a cause of action for aiding and abetting fraud, because the Michigan Supreme Court has not yet done so. Keiter cites a recent Michigan Court of Appeals decision in support. *See Genesee Intermediate Sch. Dist. v. City of Flint Sch. Dist.*, 2020 WL 4915430, at *12 (Mich. Ct. App. Aug. 20, 2020) ("Our Supreme Court has never recognized a cause of action for aiding and abetting fraud, nor has our Supreme Court ever held that the phrase 'aiding and abetting' may be placed in front of any tort to create a cause of action for aiding and abetting that tort."). However, in that unpublished decision, the court

21

refused to consider "expanding the common law to create such a cause of action," because the parties had not adequately briefed the issue and because a state statute precluded the claim in those circumstances. *Id.* at *12-13.

This Court, sitting in diversity and confronted with an unresolved question of state law, "must predict how the question would be decided by that state's highest court." *Stahle v. CTS Corp.*, 817 F.3d 96, 99 (4th Cir. 2016).   Here, the weight of published Michigan Court of Appeals decisions recognizing aiding and abetting torts outweighs the unpublished decision in *Genessee* not to recognize aiding and abetting fraud. *See El Camino Res. Ltd.*, 712 F.3d at 922 (citing *Echelon Homes, L.L.C. v. Carter Lumber Co.,* 683 N.W.2d 171, 179 (Mich. Ct. App. 2004), *rev'd in part on other grounds by* 694 N.W.2d 544 (Mich. 2005) (recognizing both aiding and abetting breach of fiduciary duties and aiding and abetting conversion); *Kratze v. Indep. Order of Oddfellows, Garden City Lodge No. 11*, 475 N.W.2d 405, 408 (Mich. Ct. App. 1991), *rev'd in part on other grounds by* 500 N.W.2d 115 (Mich. 1993) (recognizing aiding and abetting trespass); *Trail Clinic, P.C. v. Bloch,* 319 N.W.2d 638, 641 (Mich. Ct. App. 1982) (recognizing aiding and abetting conversion)).   Ultimately, the Court need not decide whether the cause of action of aiding and abetting fraud exists in Michigan, because, even if it exists, the Court finds that Plaintiff has not sufficiently alleged facts to state a claim under the cause of action as the Sixth Circuit has defined it. *See El Camino Res. Ltd.*, 712 F.3d at 922 (requiring "(1) knowledge of wrongful conduct by the aider/abettor; and (2) substantial assistance of the wrongful conduct by the aider/abettor.").

Defendant argues for this finding, stating that, should the Court allow Plaintiff to proceed on a theory of aiding and abetting, the Complaint fails to allege facts sufficient to demonstrate that Keiter knew of the Live Well price-fixing scheme.  (Def.'s Reply at 18-19.)  The Sixth

Circuit has reasoned that, under Michigan law, a claim for aiding and abetting wrongful conduct would require actual knowledge of the wrongful conduct, rather than merely constructive knowledge. *El Camino Res. Ltd.*, 712 F.3d at 922-23. Although a plaintiff may prove actual knowledge by circumstantial evidence, Flagstar has not sufficiently alleged actual knowledge here. *Id.* at 922.

No factual allegations support an inference that Keiter actually knew of Live Well's underlying fraud. Flagstar has alleged Keiter's knowledge of the Live Well fraud in conclusory terms. (Compl. ¶ 78 ("Upon information and belief, Keiter knew that the Financial Statements supplied by Live Well were fraudulent.").) However, the facts alleged do not give rise to an inference of actual knowledge; they instead portray Keiter as an ignorant yet reckless auditor. (*E.g.* Compl. ¶¶ 2 ("Despite auditing Live Well from the beginning to the end of the scheme, Keiter somehow failed to detect the fraud."), 5 ("Keiter should — and easily could — have compared the prices Live Well received from the pricing service with prices that were available from other pricing services. If it had, it . . . . would have exposed the fraud."), 6 ("Keiter should also have evaluated the underlying inputs and methodologies that the pricing service used to generate those prices. This standard process would have revealed [the fraud].").) These facts only support an inference of constructive knowledge. A plaintiff may, of course, plead facts in the alternative, but Flagstar has not done that here. No facts support an inference that Keiter had actual knowledge of the Live Well fraud.

Flagstar argues that at this stage, under the special pleading requirements of Rule 9(b), a plaintiff may generally allege knowledge. (Pl.'s Resp. at 33.) However, even if Rule 9(b) applies to a claim of aiding and abetting fraud, as to this Count the Complaint fails to meet the basic plausibility requirements of Rule 8. *See Iqbal*, 556 U.S. at 686-87 ("Rule 8 does not

empower [plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss.")  The Court finds that Plaintiff's Complaint fails to allege that Keiter had actual knowledge of the Live Well price-fixing fraud.

Because Keiter cannot have aided and abetted fraud without actual knowledge of the fraud, the Court need not address whether Plaintiff adequately alleged the existence of the underlying fraud or Keiter's substantial assistance.  Accordingly, the Court hereby GRANTS Keiter's Motion as to Count Two and DISMISSES Plaintiff's aiding and abetting fraud claim.

### C.     Negligent Misrepresentation

Michigan's Accountant Liability Act holds accountants liable in negligence to non-client third parties only if both the accountant and client identify the third party as an intended beneficiary of the accounting services.[3]  Mich. Comp. Laws § 600.2962(1).  For a third party to have standing for negligent misrepresentation, the law specifically requires that two writings identify that third party:  (1) a writing from the client to the accountant representing that it primarily intends to use the accountant's services to benefit or influence the third party, and (2) a writing from the accountant to the client stating that it intends the third party to rely on its services. *See Riley v. Ameritech Corp.*, 147 F. Supp. 2d 762, 773 (E.D. Mich. 2001) (holding that the statute requires both writings).

In relevant part, Michigan's Accountant Liability Act states:

(1) This section applies to an action for professional malpractice against a certified public accountant.  A certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant only in 1 of the following situations:

---

[3]     Only four states, including Michigan, take this approach to non-client liability for negligence. Jay M. Feinman, *Liability of Lawyers and Accountants to Non-Clients: Negligence and Negligent Misrepresentation*, 67 Rutgers U.L. Rev. 127, 147-48 (2015).

. . . .

(c) Subject to subsection (2), a negligent act, omission, decision, or other conduct of the certified public accountant if the certified public accountant was informed in writing directly by the client before commencement of the engagement that a primary intent of the client was for the professional public accounting services to benefit or influence the person bringing the action for civil damages. For the purposes of this subdivision, the certified public accountant shall also separately identify in writing directly to the client, before commencement of the engagement, each person, generic group, or class description that the certified public accountant intends to have rely on the services. The certified public accountant may be held liable only to each identified person, generic group, or class description. The certified public accountant's written identification shall include each person, generic group, or class description identified by the client as being benefited or influenced.

(2) A certified public accountant is not liable for civil damages in any of the following situations:

. . . .

(c) The claimant is not the certified public accountant's client, but asserts standing to sue based on a writing referred to in subsection (1)(c) that was not signed by the client himself or herself, if an individual, or that was not signed by an officer, manager, or member of the client, if an entity.

Mich. Comp. Laws § 600.2962. Accordingly, for a third party to prevail against an accountant for negligent misrepresentation, the accountant and the client must both identify that third party in signed writings.

Keiter argues that Flagstar's negligent misrepresentation claim fails, because it does not allege the existence of either writing. (Def.'s Reply at 19-20.) Flagstar argues that its Complaint satisfies M.C.L. § 600.2962, because, in Paragraph 85 it states, "Upon information and belief, Keiter knew or had reason to know that Live Well's lenders (including Flagstar) were relying on its material misrepresentations and intended for lenders (including Flagstar) to rely on them." (Pl.'s Resp. at 35.) However, this allegation will not suffice.

In *Riley v. Ameritech*, a counterclaimant alleged that the client had informed the accounting firm that "a primary intent of [the client] was for the professional accounting services to benefit or influence [the counterclaimant]." 147 F. Supp. 2d at 773.  Although the counterclaimant specifically alleged the existence of the required writing from the client to the accounting firm, it failed to allege that the accounting firm had reciprocated with a writing also identifying the counterclaimant as an intended beneficiary of the accounting services. *Id.*  The district court dismissed the counterclaim, citing *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir. 1993), for the proposition that "a complaint must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory." *Id.* at 774.

Flagstar's negligent misrepresentation claim fails for the same reasons.  A negligent misrepresentation claim against an accountant in Michigan requires material elements that Flagstar's claim fails to allege:  reciprocal signed writings identifying Flagstar as an intended beneficiary of Keiter's Live Well audits.  Although Flagstar argues Keiter must have known that third-party lenders such as Flagstar would rely on its audits, that allegation does not support an inference that Live Well and Keiter exchanged signed writings identifying Flagstar as an intended beneficiary of the audits. (*See* Pl.'s Resp. at 35 ("Here, as Live Well's long-time auditor, Keiter must have known that Live Well was borrowing large amounts of money from sophisticated lenders, who were reviewing Live Well's Financial Statements as part of their ordinary pre-lending diligence.  Keiter must also have known that Flagstar was one of Live Well's largest lenders.").)  As no other allegation allows the Court to infer the existence of the required writings, Count Three lacks material elements.

Plaintiff cites several cases in support of its claim that ultimately prove inapposite. (Pl.'s Resp. at 34-36.) First, in *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, the Michigan Court of Appeals established the common law elements for negligent misrepresentation liability for accountants without reference to reciprocal writings, but that case merely represents the law prior to the enactment of the statute seven years later. 436 N.W.2d 70, 81-82 (Mich. Ct. App. 1989) (adopting Restatement (Second) of Torts § 552 approach to negligent misrepresentation liability for accountants to third parties). Second, the Sixth Circuit, in *Molecular Tech. Corp. v. Valentine*, stated that any third party may hold a defendant liable if it proved reasonably foreseeable to the defendant that the third party would rely on its representations. 925 F.2d 910, 919 (6th Cir. 1991) ("The tort of negligent misrepresentation in Michigan imposes a duty in favor of all those third parties who defendant knows and should reasonably foresee will rely on the information in question."). However, that case did not involve liability of accountants and it occurred prior to the enactment of the statute. Third, in *Wells Fargo Advantage Nat'l Tax Free Fund v. Helicon Assocs., Inc.*, the district court allowed a common law negligent misrepresentation claim to go forward after enactment of the statute, but the plaintiff raised it against a law firm, thereby not implicating the statute. 2010 WL 11541839, at \*1, \*12-13 (E.D. Mich. Mar. 15, 2010). Because these cases represent the state of Michigan negligent misrepresentation law before the enactment of the statute or for professionals other than accountants, they have no bearing on the case at hand.

Therefore, Flagstar's negligent misrepresentation count fails to state a claim upon which relief can be granted. Accordingly, the Court hereby GRANTS Defendant's Motion as to Count Three and DISMISSES Plaintiff's negligent misrepresentation claim.

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion to Dismiss.  Specifically, the Court DENIES Defendant's Motion as to Count One of the Complaint.  However, the Court GRANTS Defendant's Motion as to Counts Two and Three.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak

United States District Judge

Richmond, Virginia

Date: January 13, 2022